584 A.2d 1274

**Henry POLK**

v.

**STATE of Maryland.**

**No. 1813, Sept. Term, 1989.**

Court of Special Appeals of Maryland.

Jan. 30, 1991.

Gary S. Offutt, Asst. Public Defender (Alan H. Murrell, Former Public Defender, on the brief), Baltimore, for appellant.

Diane E. Keller, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Davis R. Ruark, State's Atty. for Wicomico County, Salisbury, on the brief), for appellee.

Submitted before GARRITY, ROSALYN B. BELL and JAMES S. GETTY (Retired, Specially Assigned), JJ.

JAMES S. GETTY, Judge Specially Assigned.

Henry Polk, the appellant herein, admittedly stabbed Victor Thomas with a knife causing Thomas's death shortly thereafter. At trial, Polk waived his right to a jury trial, his right to testify in his own behalf, his right to cross-examine the witnesses against him, and his right to call additional witnesses or present any defense other than his proffered statement. He now requests that we reverse his conviction for second degree murder because, although he does not question the sufficiency of the evidence relied upon by the court, he asserts the evidence submitted equally supports an acquittal or manslaughter verdict.

What is clear from this record is that what would have been an uncomplicated case, had it been tried before the

court or by a jury, now involves issues that are not so easily resolved, including when a fact-finder may judge either the credibility of a witness, or the reliability of the evidence offered, without observing the witness.

The State advised the trial judge, "Your Honor, there is a plea agreement reached in this case." There was no plea agreement. Polk entered a "not guilty" plea; the agreement involved the method of proceeding with the case, *i.e.*, by stipulation. The State then informed the court that it was proceeding on "an agreed statement of facts." It was not. The State's witnesses described an unprovoked attack by Polk upon the deceased. Polk's statement was exculpatory; he labeled the deceased as the aggressor. The State was proffering a submission of evidence, not an agreed statement of facts.[1] The former is a statement of the content of the testimony of an absent witness which may conflict with other evidence; the latter is an agreement as to the ultimate facts in the case upon which judgment may be rendered.

A detailed recitation of the evidence before the court is essential in deciding the two issues raised by Polk, to-wit:

1.  Did the trial court err when it convicted appellant of second degree murder even though the statement it found to support the conviction could also have supported an acquittal or a verdict of manslaughter?

2.  Did the trial court err when it held appellant could not prevail under any self-defense theory because he was the original aggressor?

### Agreement

The State proffered the testimony of nine witnesses, four of whom were defense witnesses; seven of the nine witnessed the killing. We shall set forth the evidence prof-

---

1.  For an in depth discussion of the distinction between an agreed statement of facts and a submission of evidence, *see Barnes v. State*, 31 Md.App. 25, 354 A.2d 499 (1976) (Orth, J.).

fered by the State. If called to testify, the witnesses would relate the following sequence of events:

**Johnie Mae Thomas,** widow of the deceased, saw her husband alive at their home in Fruitland at 3:00 p.m. on March 24, 1989. He left the home, accompanied by Leroy White and Floann Frazier, to go to a store. Shortly after 4:00 p.m., Polk came toward her home and told her "I just hit Vic." She inquired if Vic hit him back and Polk responded, "No, I meant I stabbed him." Mrs. Thomas went to the hospital where she learned that her husband was dead. To the best of her knowledge, her husband was not armed with a knife that day.

**Relysee Haywood** answered a knock at his door at approximately 4:00 p.m. and a man he did not know asked him to call a paramedic, adding that he had been stabbed. An ambulance and the police were summoned, but the victim was no longer able to respond to any questions.

**Donna Corbin** was at the scene of the altercation which took place at 214 Popular Street in Fruitland. Also present were Polk, his sister Mary Polk, Pam Justice, and several other unnamed individuals. Polk and his girl friend, Pam Justice, were arguing inside the apartment and Polk was holding a knife at Pam's throat. The participants and the others at the scene then went outside. Corbin observed Polk push Pam onto a sofa beside the building while continuing to hold a knife at her throat. Mary Polk and Robert Frisby, Polk's brother, were attempting to separate the two. Among the group of bystanders was the victim, Victor Thomas, who was not among those inside the house where the assault began.

According to Corbin, Polk went crazy and went to the front of the building where the victim was standing near a tree with a beer can in his hand. Polk grabbed the victim by his jacket while still holding a knife in his hand. Mary Polk struck the victim with a bottle. Polk knocked him to the ground, got on top of him and hit him. Mary Polk hit him a second time with a bottle and kicked him.

Polk was pulled away from Thomas by other bystanders and still had a knife in his hand when he got up. He washed the blood from the knife and from his hands in a puddle of water and threw the knife into the road in front of the house. This was the same knife, according to Corbin, that Polk held to Pam Justice's throat. Corbin did not see the victim exhibit any knife and would describe him as standing there minding his own business.

**Rosetta Fontaine** observed the activity from her apartment window. She saw Robert Frisby take a brick from Polk and throw it over a fence. Polk then went from the side of the building to the front, approached the victim, and knocked him to the ground. He got up and was knocked down again and struck and kicked by Mary Polk and two others present. Polk was bent over the victim and Fontaine saw someone pulling at Polk's hands, but she did not see a knife until Polk ran from the area. At that point, she saw a knife on the ground.

**Floann Frazier** would testify that she, the victim, and Leroy White went to the store for beer. White drove to the apartment complex and Frazier went into a friend's apartment, at which time Polk came in and took a knife from a kitchen drawer. Frazier went outside and observed Polk holding a knife to Pam Justice's throat while his sister and brother attempted to separate him from Pam. She saw Mary Polk strike the victim with a bottle and saw Polk jump on him after the victim was knocked to the ground and Polk then stabbed him with the same knife he held during the incident with Pam Justice.

**Melvina Garrett** observed Polk holding the knife to Pam's throat inside the apartment. Later, she saw the victim standing outside and would testify that Polk approached him and said, "What are you looking at?" The victim responded, "Just looking." Someone then hit the victim with a bottle, knocking him to the ground, Polk got on top of him, and Robert Frisby kicked the victim. Polk got up and ran. Garrett did not see any knife.

The State then recounted what the defense witnesses would relate if called.

**Linda Gibson** went to the store and bought beer for Polk and others, including the victim, who was outside of the building. She was outside talking to the victim and saw Polk holding a knife to his girl friend's throat. Polk's sister and brother, with the help of another sister, Darlene Frisby, were attempting to separate Polk from Pam. Gibson and the others were standing near a tree in front of the building watching the altercation between Polk and Pam. Polk approached the victim, grabbed him, and said, "What's your problem? To which the victim responded, "Get off." Polk still had the knife in his hand, but Mary Polk took it and threw it over the fence. Polk was on top of the victim punching him. Gibson observed Polk washing blood from his hands in a puddle after he was pulled from the victim. Gibson would have testified that she had seen a knife in the victim's sleeve, but she did not see him pull it out; he was just watching like the others.

**Andrew Parsons** accompanied Gibson on the trip to the store. He observed the victim shove something that appeared to have a brown handle under his sleeve. He saw the knife incident involving Polk and Pam that all those present were watching. He would testify that Polk suddenly came toward the victim, there was some cursing and Polk pushed the victim to the ground. Polk had a knife in his upraised hand, that hand came down toward the victim, and when the hand came back up the knife was not there. The witness did not see the victim pull a knife and he had no chance to defend himself from those who were kicking him.

**Robert Frisby** would testify that he observed the victim reach in his sleeve prior to the stabbing incident and that he and his two sisters intervened to stop Polk from attacking Pam. When Polk saw the victim, he snapped. Polk grabbed the victim, forced him to the ground and punched him in the chest. After being pulled away from the victim, Polk ran from the area.

**Polk's** testimony, as related to Corporal Truitt while being processed after his arrest, would be: The victim came at him with a knife in his hand stating, "Nigger, who do you think you are?" Polk would testify he was cut on the right hand when the victim attempted to stab him. Polk wrested the knife from the victim, stabbed him twice and left the area.

The autopsy report confirmed that the victim died from internal bleeding as a result of two stab wounds to the right chest area, one wound penetrating to a depth of 3 and one-half inches and the other to 4 and one-half inches.

Following this recitation by the State, the court inquired if defense counsel agreed with the State's summation of the evidence. The response was:

We will submit on the facts. We have no additions or corrections to those facts as presented.

The defense made no motion for judgment of acquittal.

On appeal, Polk relies upon the holding in *Barnes v. State, supra,* in seeking a reversal of his conviction. In *Barnes,* the parties initially proceeded on a statement of facts that were not disputed and the defendant entered a plea of not guilty. Thereafter, the defendant proffered that if she testified, she would contend that she did not conceal the merchandise she was accused of stealing. This evidence was in direct conflict with the prior stipulation of what the State's witnesses would show. The trial court, with no comment whatever, resolved the conflict by finding the defendant guilty. We held that the court made an arbitrary choice and reversed. We pointed out that neither the State's evidence nor the defendant's evidence was inherently incredible and there were no factors in the record that would enable the court to judge the credibility of either witness, or the reliability of the evidence offered through them.

We did not, however, rule out the proposition that in a given case the fact-finder may be able to judge the

credibility of a witness, or the reliability of the evidence offered through him, without observing the witness.[2]

■ The trial judge herein, unlike in *Barnes*, did not arbitrarily, without comment, render a guilty verdict. The court noted that all of the witnesses, including the defense witnesses, except Polk, have Polk attacking the victim without provocation. The court concluded from this evidence that Polk was the aggressor, that he initiated the fight, that he was armed with a knife, and that no one saw the victim pull a knife. The fact that Polk was armed and threatening Pam Justice with a knife immediately before the fatal assault was uncontroverted.

We note that, in addition to Polk's exculpatory proffer, his witness, Linda Gibson, would have testified that she had seen a knife in the victim's sleeve, but did not see him pull it out. She also indicated that Polk had a knife, but "Mary Polk took it and threw it over the fence." If this version of the incident is deemed credible, Polk would necessarily have stabbed the victim with the victim's knife, which is corroborative of Polk's account of the altercation.

Additionally, defense witness Andrew Parsons's recollection of the event includes the statement that he "observed the victim shove something that appeared to have a brown handle under his sleeve." He observed a knife in Polk's hand, but he did not see the victim pull a knife. This proffered testimony lends some support to the proffers from Gibson and Polk that the victim possessed a knife, but does not support a reasonable inference that he attempted to use it.

---

**2.** The court in *Barnes, supra,* acknowledges that cases may arise where reliability of evidence, or credibility, may be judged without observing the witness. Such determinations, the Court suggests, are to be decided on a case-by-case basis. Although the Court gave no examples of such cases, we concede that such a scenario could arise where some of the evidence submitted may be characterized as inherently incredible, mathematically impossible, or, for some other compelling reason that the trier of fact may reasonably rely upon.

Finally, defense witness Robert Frisby would have testified, according to the proffer, that "he observed the victim reach in his sleeve prior to the stabbing incident." The victim's wife, Johnie Mae Thomas, would have testified that to the best of her knowledge the victim was not armed with a knife "that day."

The trial court concluded that the defendant, Polk, was the aggressor and that the factors necessary to establish self-defense were not established. Accordingly, the court found Polk guilty of murder in the second degree. We agree that the same evidence, if presented by the witnesses under oath, could and probably would support the verdict of second degree murder. The problem that arises in this case, however, is that the State's entire case consists of proffered testimony that is not only contradictory, but is further exacerbated by the fact that neither version of the events that occurred on March 24, 1989, is inherently implausible.

The State has recounted what was unquestionably an explosive and excitable confrontation involving Polk, his girl friend, and the victim, viewed by seven witnesses from various vantage points at the scene. The fact that the witnesses gave different accounts of the fatal encounter between Polk and the victim is neither surprising nor unprecedented. On these contradictory facts, however, the trier of fact has absolutely no basis on which to judge the credibility of the proffered testimony and, in the absence of an opportunity to make that determination, a conviction cannot stand.

We reiterate what we said in *Barnes, supra,* that cases may arise where the trier of fact may judge the credibility of a witness or the reliability of the evidence offered through him without observing the witness. We hold, however, that where, as here, the evidence consists solely of proffered evidence which is conflicting in material part, so that there is no agreement as to the facts and no opportunity for the fact-finder either to judge the credibility of the witnesses, or to ascertain the reliability of that evidence,

there is no proper way to resolve the evidentiary conflicts in order to determine ultimate facts which would be sufficient in law to sustain a verdict of guilty. The obvious solution to the problems presented by cases such as the one before us is for the State to refrain from presenting such cases by stipulation rather than by trial and for the trial court to refuse to accept such proffers when presented.

JUDGMENT REVERSED. REMANDED TO THE CIRCUIT COURT FOR WICOMICO COUNTY FOR NEW TRIAL.

COSTS TO BE PAID BY WICOMICO COUNTY.