850 A.2d 1179

**Ricky KNIGHT**

v.

**STATE of Maryland.**

**Steven Daniel Sirbaugh**

v.

**State of Maryland.**

**Nos. 93, 94, Sept. Term, 2003.**

Court of Appeals of Maryland.

June 7, 2004.

Stacy W. McCormack, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), for petitioner.

Sarah Page Pritzlaff, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and JOHN C. ELDRIDGE, (retired, specially assigned), JJ.

HARRELL, J.

These two otherwise unconnected cases, *Sirbaugh v. State*, No. 94, September Term 2003, and *Knight v. State*, No. 93, September Term 2003, each present the question of whether an interrogating officer's assumedly truthful promise to a criminal suspect to report to the prosecuting authority that the suspect cooperated with an investigation is an improper inducement that renders a subsequent statement by that suspect involuntary under Maryland non-constitutional law and, therefore, inadmissible at trial.

Petitioner Steven Daniel Sirbaugh was told by police officers that if he cooperated during a custodial interrogation, the interrogating officers would inform the State's Attorney "that when we asked a question he answered it." Sirbaugh then confessed to driving the getaway car in a 29 October 2000 robbery of a convenience store in Owings Mills, Maryland. Although he sought to exclude this confession from coming into evidence at his trial, he failed. Based in large measure on his confession, Sirbaugh was convicted of robbery.

Petitioner Ricky Lee Knight, after being arrested in an unrelated robbery case, provided police with information regarding an unresolved murder in Baltimore City. He was brought to the Homicide Division, where he was asked to repeat his statement regarding the murder so that it could be recorded. During the course of the custodial interrogation leading up to the second statement, he was told that his cooperation "would be helpful" and that the State's Attorney would be informed of his cooperation. Knight was also told "down the line, after this case comes to an end, we'll see what the State's Attorney can do for you, with your case, with your charges." Knight's second statement, which, unlike his first statement, was recorded, was essentially identical in content to the first. Knight, like Sirbaugh, also sought unsuccessfully to suppress these inculpatory statements. Those statements led eventually to his conviction for the murder.

Sirbaugh and Knight each argue that their statements were given in reliance on improper inducements, and were therefore

involuntary. Because an interrogating officer's truthful promise to inform a prosecutor of a suspect's cooperation during a custodial interrogation is not an improper inducement, we affirm Sirbaugh's conviction. While the same holds for the similar statements interrogating officers made to Knight, the interrogating officers' further promise to "see what the State's Attorney can do for you" was an improper inducement. That promise, however, could not have caused Knight to make his statement because it was made after Knight's initial statement to the police. The content of the two statements was identical. We affirm Knight's conviction.

## I.

### A. *Sirbaugh*

While sitting in a pickup truck parked in a convenience store parking lot in Owings Mills waiting for her husband to make purchases, Patricia Ann McConville saw a red car drive up Tollgate Road, the street next to the store. The time was approximately 4:00 p.m on 29 October 2000. The red car proceeded past the entrance to the store's parking lot and then backed down the street, where it pulled over to the shoulder across the street from the store. Its driver kept the engine running. A passenger got out of the red car and walked to the store. The passenger stood in front of the convenience store without entering for "quite a while." Only when McConville's husband left the store and returned to his truck did the man enter the store.

Once inside, the man asked Brooke Presser, the sole employee in the store, for change for a dollar. When Presser opened the drawer of the cash register, the man reached over and grabbed all of the money out of the register. He did not display a weapon, but told Presser to get down on the ground or he was going to kill her. Shaking and crying, Presser complied. According to Presser, the man left with between $130 and $150 from the register.

As McConville and her husband drove away, they saw the man sprint out of the store toward the red car. When he

reached the red car, it began to move and continued to roll slowly as he entered it. The car sped away, running a stop sign in the process.

On 7 November 2000, Baltimore County Police officers arrested Erland Edward Roessler, III. Roessler confessed to committing a series of robberies, including the 29 October 2000 robbery of the convenience store in Owings Mills. Roessler told police that he had usually been the "inside man," and that a man named "Steve" usually drove the automobile they used in the robberies. When shown a photograph of Sirbaugh, Roessler confirmed that Sirbaugh was the accomplice named "Steve" with whom he committed the robberies. He gave police officers sufficient information with which to locate Sirbaugh's residence.

Sirbaugh was located by police in Carroll County on 11 November 2000. He was arrested and brought to the Maryland State Police barracks in Westminster. There he was interrogated by Maryland State Police Corporal Christina Becker and Hampstead Police Officer Clint Thorn. According to the unreported Court of Special Appeals's opinion in Sirbaugh's case:

"Becker advised Sirbaugh of his rights, and Sirbaugh said that he understood them. He initialed and signed a waiver of rights form. Sirbaugh did not make a written statement, but agreed to sign the notes that Becker had taken during the hour-long interview, which occurred between 1:35 and 2:35 a.m. Becker did not know when Sirbaugh last had eaten or slept, but said that the police normally offer a person being interviewed a soda. Becker testified that she did not threaten Sirbaugh or make any promises to him.

"Thorn testified that he was present for the entire interview with Sirbaugh, and that neither he nor anyone in his presence promised Sirbaugh anything or threatened him to get him to make a statement. Sirbaugh appeared to understand his rights and did not ask for an attorney."

The following exchange concerning Sirbaugh's post-arrest interrogation took place during cross-examination of Officer

Thorn at the motion to suppress hearing that preceded Sirbaugh's trial in the Circuit Court for Baltimore County:

"[Defense Counsel]: Now, during the process, particularly during the *Miranda*,[1] you told him that if he cooperated you would let the State's Attorney know that he was cooperating?

"[Officer Thorn]: Sure.

"[Defense Counsel]: Did he understand that, that you would let the State's Attorney know he was cooperating if, in fact, he did cooperate?

"[Officer Thorn]: I believe he was under the impression that if he cooperated with us in answering questions that we asked, that we would relay that information to the State's Attorney that when we asked a question he answered it.

"[Defense Counsel]: Did you tell him that it might go easier on him, that it could affect his sentencing if he cooperated with you as opposed to not cooperating with you?

"[Officer Thorn]: No, I did not."

Sirbaugh confessed to Corporal Becker and Officer Thorn that he drove the getaway car in the 29 October 2000 convenience store robbery. According to Corporal Becker's trial testimony:

"Mr. Sirbaugh stated his participation in the robbery of the High's Store, that he had driven to the High's, which is located on Reisterstown Road near the area of Tollgate Road. He said that he had driven his ex-boss's car, which is a red Dodge Neon.

"He had parked approximately a half a mile away from the store where he remained in his vehicle. He said after the robbery that he had gone to the Baltimore City area."

Sirbaugh was charged with robbery.[2] Prior to the trial and as previously alluded to, the trial court held a hearing on

---

1. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. Sirbaugh was charged with several other crimes related to other events, none of which are relevant to this appeal. Additionally, he was

Sirbaugh's motion to suppress the confession. At the conclusion of that hearing, the trial judge ruled in favor of the State and ultimately allowed the confession to be admitted as evidence at the trial.[3] The primary evidence used by the State at the 24 January 2002 jury trial to connect Sirbaugh to the robbery was Sirbaugh's confession. Sirbaugh was convicted of robbery. Because it was his third conviction for a crime of violence, he was sentenced to the mandatory term of twenty-five years in prison.[4]

## B. *Knight*

According to the unreported opinion of the Court of Special Appeals in Knight's case:

"On the evening of January 25, 2000, Wiley 'Iceberg' McCroery, a drug dealer, was shot and killed at the corner of North Carey Street and Harlem Avenue in Baltimore. Police investigators learned that the victim was shot by someone known as 'Little Ralph,' who was later identified as Ralph Williams. The police also learned that someone named 'Ricky,' later identified as appellant, often hung out with Williams and that 'Ralph and Ricky' were known to be

---

charged with second-degree assault and theft based on the 29 October 2000 convenience store robbery. During the trial, the State *nol prossed* the assault charge and the trial court granted Sirbaugh's motion for judgment of acquittal as to theft.

3. The suppression hearing judge stated at the conclusion of the suppression hearing:

"I find that because his testimony is inconsistent, that he was advised of his rights per *Miranda*. He initialed them; he signed the statement, that he was not threatened or intimidated, that he understood his rights and voluntarily agreed to waive them without any threats, promises or inducements of any kind. And the standard here is preponderance of the evidence, and by a preponderance of the evidence I find the motion to suppress will be denied."

4. At the time of Sirbaugh's sentencing, the statute that provided for a mandatory minimum sentence for a criminal convicted of a third violent crime was located at Maryland Code (1957, 2001 Repl.Vol.), Art. 27 § 643B. It has since been recodified, with some substantive changes not relevant to this case, at Maryland Code (2002), § 14–101 of the Criminal Law Article.

'stickup boys' in the Western District, where the killing occurred.

"On June 8, 2000, Williams and appellant were arrested on an unrelated robbery charge. Shortly after their arrest, appellant was interviewed by Detective Sergeant Darryl Massey, who was assigned to the Criminal Investigation Division in the Western District. During the interview, [which was held in the Criminal Investigations Division Office,] appellant revealed information about the murder, so he was taken to the Homicide Office to meet with Detective Kevin Buie, who was in charge of the murder investigation. There, the detectives conducted a tape-recorded interview of appellant concerning the murder. The tape recording and a transcript made from it were later admitted into evidence at appellant's trial. In that interview, appellant told the following story.

"On the day of the murder, Williams and appellant caught a 'hack' [5] and went to McCulloh Street to pick up a third man, [Antonio Jones,] who had a gun, and then proceeded to drive elsewhere to commit robberies. Appellant rode along 'to make sure that the hack wouldn't leave.' When they saw the victim, they drove down the street about three or four houses from the corner. Williams and [Jones] jumped out of the car and walked up the street to where the victim was, to rob him. Some time later, [Jones] returned to the car, and appellant 'heard some shooting.' Then Williams arrived and announced that he 'had to kill' the victim. Williams pulled out $100 in cash, and [Jones] pulled out $150 worth of heroin."

Police officers, seeking to corroborate Knight's story, attempted to track down the alleged third member of the scheme, Antonio Jones. They discovered that Jones had been in jail at the time of the murder and could not have been involved in the crime. Despite this apparent untruth, certain details of Knight's version of events matched particular facts of the murder case not made public. Knight ultimately was

---

5. The word "hack" is slang for "an unlicenced taxicab."

**528**

indicted in the Circuit Court for Baltimore City for the murder.

Knight filed a motion to suppress his statement to the police. During the hearing on the motion, Detective Sergeant Massey, who conducted the initial interview in the Criminal Investigations Division Office, testified that he made no promises to Knight before Knight made his initial statement.[6] Detective Buie, who led the second interview recorded at the Homicide Division, testified as follows:

"[Defense Counsel]: Now, did you indicate to him on that first night, on June 8th, when you were at the Homicide Unit, that you could take care of some of these robberies, the robbery charge if he helped you out with Ralph Williams?

"[Detective Buie]: No, it's not my position to make any deals if that's what you're saying. He was advised of his rights, and a statement was taken. Anything that would be done for Mr. Knight—I didn't communicate any offers to him. I'm sure that he knew with his cooperation in the trial that maybe down the line something could be done for him. But it's not my purpose or point to make a deal that I can't see through.

"[Defense Counsel]: Well, by the time he was meeting with Mr. Urick, he would have had the opportunity to speak to the Assistant State's Attorney about whether or not you could help him out. Is that correct?

"[Detective Buie]: Sure. I had communications with Mr. Urick throughout the whole case.

"[Defense Counsel]: And did you have communications with Mr. Knight about what his cooperation could do for him?

---

6. According to Detective Sergeant Massey's testimony at the suppression hearing:
 "[Defense Counsel]: [Y]ou indicated to him that if he talked to you about this, you might be able to help him out. Is that correct?
 "[Detective Sergeant Massey]: That's one thing I never do. I can't help him."

"[Detective Buie]: No. Other than the initial time that I met him, we writted him out and brought him over to Mr. Urick's office to get some more information, that would probably be that last time that I actually saw him or spoke with him. I didn't have any communication with him while he was in jail.

"[Defense Counsel]: But on the night that he gave this [the recorded] statement, there was some, it was somehow translated to him that his cooperation would be helpful. Is that correct?

"[Detective Buie]: It's always helpful. I think what we said to him, myself and Detective Sergeant Massey was, you have information in this case. We want the information in this case. We can't promise you anything, and on tape we said that to him several times. If down the line, after this case comes to an end, we'll see what the State's Attorney can do for you, with your case, with your charges, but no deal if you say this, we'll do that. We can't do that. And that's the problem that we run into."

According to Detective Sergeant Massey, the content of the statement he and Detective Buie recorded at the Homicide Division office was identical to the statement Knight previously gave in the Western District Criminal Investigations Division Office.[7]

---

7. According to Detective Sergeant Massey's testimony at the suppression hearing:
"[Defense Counsel]: Now, at the Western District, you Mirandized him, and then what caused you to take him from the Western District to the Homicide Unit?
"[Detective Sergeant Massey]: The information that he provided about his involvement in the murder that occurred on January 25th of that year.
"[Defense Counsel]: Now, that is not a statement that you recorded. Is that correct? That information that was provided at the Western District, do you have any record of that statement?
"[Detective Sergeant Massey]: Yes Ma'am. That's the transcript, the tape that was taken. The facts that he told me there, I took him down to Homicide, and those facts were there recorded. It was the exact information that he provided at the Western District.
"[Defense Counsel]: Uh-huh

The suppression hearing judge determined that Knight's statement was admissible:

"I do not find the fact that the defendant was told that his cooperation would be brought to the attention of the State's Attorney to be an inducement for his testimony, and as indicated, the defendant was properly Mirandized. That he may have testified in the hopes of getting a reward down the line is not a sufficient basis for suppressing a voluntary statement.

"Accordingly, the motion to suppress is denied."

The recorded statement was presented as evidence before the jury at Knight's trial. Knight was convicted of second degree murder, use of a handgun in a crime of violence, robbery with a deadly weapon, robbery, conspiracy to rob with a deadly weapon, and conspiracy to rob. He was sentenced to thirty years in prison for second degree murder, twenty years for use of a handgun in a crime of violence, twenty years for robbery with a deadly weapon, and twenty years for conspiracy to commit robbery with a deadly weapon. Each of these sentences were to be served consecutively. The remaining counts—robbery and conspiracy to commit robbery—were merged with robbery with a deadly weapon and conspiracy to commit robbery with a deadly weapon, respectively.

### C.

In their direct appeals, Sirbaugh and Knight challenged the denials of their suppression motions. The Court of Special Appeals, rejecting their arguments, separately affirmed in unreported opinions. In affirming each judgment, the intermediate appellate court relied on *Boyer v. State*, 102 Md.App. 648, 651 A.2d 403 (1995). In *Boyer*, the Court of Special Appeals held that a truthful promise by police to inform the

"[Detective Sergeant Massey]: That's what he provided down at the Homicide Unit.
"[Defense Counsel]: You didn't tape it at the Western District?
"[Detective Sergeant Massey]: No, sir. No ma'am, not at all. I'm sorry."

State's Attorney that the defendant cooperated is not an improper inducement even though it could give rise to the "perfectly reasonable assumption" that the defendant might gain some advantage from the prosecutor's knowledge of his cooperation. 102 Md.App. at 654, 651 A.2d at 406.[8]

We granted a petition for certiorari filed by Sirbaugh's attorney, 378 Md. 613, 837 A.2d 925 (2003),[9] to consider the following question:

> "Is an interrogating officer's promise to inform the State's Attorney of a suspect's cooperation an improper inducement under Maryland common law, thereby rendering statements made by the suspect in reliance on that inducement involuntary?"

Knight presented the same question in a petition for certiorari, which was granted by the Court. 378 Md. 613, 837 A.2d 925 (2003).

## II.

 Only voluntary confessions are admissible as evidence under Maryland law.[10] A confession is voluntary if it is

---

**8.** Officer Mills testified that he did not say that appellant would receive a lesser penalty if he talked, and he did not represent that it would be easier on him if he confessed. He denied telling appellant that he would help him, or that he would get him a better deal with the State's Attorney if he talked. What Officer Mills did indicate to appellant was that he would inform the prosecutor that appellant had given a statement and was cooperative. Assuming that appellant concluded that the State would be favorably impressed upon receiving such advice, which is a perfectly reasonable assumption, that conversation does not rise to the level of an improper inducement that would invalidate his confession. We perceive no error in the trial court's denial of the motion to suppress.
*Boyer*, 102 Md.App. at 653–54, 651 A.2d at 406.

**9.** Sirbaugh filed a separate *pro se* petition for certiorari, which we denied. 378 Md. 613, 837 A.2d 925.

**10.** [N]o confession or other significantly incriminating remark allegedly made by an accused [may] be used as evidence against him, unless it first be shown to be free of any coercive barnacles that may have attached by improper means to prevent the expression from being voluntary.

"freely and voluntarily made" and the defendant making the confession "knew and understood what he [or she] was saying" at the time he or she said it. *Hoey v. State,* 311 Md. 473, 480–81, 536 A.2d 622, 625–26 (1988). In order to be deemed voluntary, a confession must satisfy the mandates of the U.S. Constitution, the Maryland Constitution and Declaration of Rights, the United States Supreme Court's decision in *Miranda,* and Maryland non-constitutional law. *See Ball v. State,* 347 Md. 156, 173–74, 699 A.2d 1170, 1178 (1997). Sirbaugh and Knight specifically argue that the promises made to them by the interrogating officers were improper inducements that rendered their confessions involuntary under Maryland non-constitutional common law.

 When a criminal defendant claims that his or her confession was involuntary because of a promise made to him or her by interrogating officers, the State must present evidence in order to refute the claim. *See Streams v. State,* 238 Md. 278, 283, 208 A.2d 614, 616 (1965).[11] If the defense files a proper pre-trial suppression motion, the State bears the burden to prove, by a preponderance of the evidence, that "the inculpatory statement was freely and voluntarily made and thus was the product of neither a promise nor a threat." *Winder v. State,* 362 Md. 275, 306, 765 A.2d 97, 113–14 (2001). When lack of voluntariness is generated as an issue at trial, the State must prove voluntariness beyond a reasonable doubt. *Id.* Upon proper objection, the State must prove at trial that the statement was made voluntarily even if it already

---

*Hillard v. State,* 286 Md. 145, 150, 406 A.2d 415, 418 (1979).

**11.** We think the State's failure, after Streams left the stand, to go forward with testimony which would refute his claim of promises and threats and to show the conduct of the police during the period he was in custody of the arresting officers was enough under the circumstances of this case to require a holding that the judgments appealed from must be reversed because the State did not meet its burden of establishing the voluntariness of the confessions as a prerequisite to their admission in evidence.

*Streams,* 238 Md. at 283, 208 A.2d at 616.

prevailed on a pre-trial motion to suppress. *Baynor v. State,* 355 Md. 726, 729 n. 1, 736 A.2d 325, 326 n. 1 (1999).[12]

 Maryland courts, in order to resolve a suppression challenge, look to the "totality of the circumstances" in determining whether a confession is voluntary:

> [W]e look to all elements of the interrogation, including the manner in which it was conducted, the number of officers present, and the age, education, and experience of the defendant. Not all of the multitude of factors that may bear on voluntariness are necessarily of equal weight, however. Some are transcendent and decisive. We have made clear, for example, that a confession that is preceded or accompanied by threats or a promise of advantage will be held involuntary, notwithstanding any other factors that may suggest voluntariness, unless the State can establish that such threats or promises in no way induced the confession.

*Williams v. State,* 375 Md. 404, 429, 825 A.2d 1078, 1092–93 (2003). *See also Winder,* 362 Md. at 309, 765 A.2d at 115 (A confession made in reliance on an improper promise of assistance by an interrogating officer or an agent of the police always will be deemed involuntary under Maryland non-constitutional common law.).

In *Hillard v. State,* 286 Md. 145, 406 A.2d 415 (1979), the Court established a two-step analysis that a trial court should apply to the evidence regarding an alleged promise. First, the trial court determines whether any officer or agent of the police force promised or implied to the suspect that he or she

---

12. The question presented by each Petitioner before this Court is a bit vague as to whether the error alleged was committed by the hearing judges in denying the motions to suppress, the trial judges for admitting into evidence the statements at their trials, or at both stages of the proceedings. Each Petitioner's brief, however, focused almost entirely on the decisions by the judges at the respective motion to suppress hearings. Accordingly, we review only the voluntariness determination made by each hearing judge at the motion to suppress hearings. *See Remsburg v. Montgomery,* 376 Md. 568, 584 n. 8, 831 A.2d 18, 27 n. 8 (2003) (an issue not raised in brief or argument before the court will be regarded as having been waived).

would be given special consideration from a prosecuting authority or some other form of assistance in exchange for the confession. Second, if the court determines that such a promise was explicitly or implicitly made, it decides whether the suspect's confession was made in apparent reliance on the promise. *Winder,* 362 Md. at 309, 765 A.2d at 115 (summarizing the *Hillard* test). If the court concludes that the confession was made in reliance on an improper inducement, the confession may not be admitted as evidence at trial. *Id.*

The first prong of the *Hillard* test is an objective one. The suspect's subjective belief that he or she will be advantaged in some way by confessing is irrelevant. The trial court instead determines whether the interrogating officers or an agent of the police made a threat, promise, or inducement. *Winder,* 362 Md. at 311, 765 A.2d at 116. An improper promise or inducement occurs when "an accused is told, or it is implied, that making an inculpatory statement will be to his advantage, in that he will be given help or some special consideration." 362 Md. at 308, 765 A.2d at 115.

The second prong inquires as to the defendant's reliance on the inducement in making the statement. In other words, whether there exists a causal nexus between the inducement and the statement is examined. Several factors may inform this analysis. For example, the temporal relationship between the improper threat, promise, or inducement and the confession may convince the trial court to draw an inference as to whether the confession came as a result of improper statements by interrogating authorities. 362 Md. at 312–13, 765 A.2d at 117.[13]

---

13. We are also persuaded [that Winder's confession was induced by the improper promises made to him] by the fact that the State has failed to point out any other, intervening factors that may have caused [Winder] to confess when he did, or which may have attenuated the effect of the improper inducements. . . . [T]here is no attenuation in time or circumstance, no change of environment, and no interruptive change of the interrogation team. Appellant confessed to virtually the same team of officers, in the same environment in which his entire interrogation took place, following twelve hours of interrogation.

 "The trial court's determination regarding whether a confession was made voluntarily is a mixed question of law and fact." *Winder*, 362 Md. at 310–11, 765 A.2d at 116. An appellate court undertakes a *de novo* review of the trial judge's ultimate determination on the issue of voluntariness. *Id.* We do not look, however, at the trial record for additional information, nor do we engage in *de novo* fact-finding. *Cartnail v. State*, 359 Md. 272, 282, 753 A.2d 519, 525 (2000). Appellate review of a Circuit Court's denial of a motion to suppress is limited to the record of the suppression hearing. *Winder*, 362 Md. at 310–11, 765 A.2d at 116. "As the State was the prevailing party on the motion, we consider the facts as found by the trial court, and the reasonable inferences from those facts, in the light most favorable to the State." *Cartnail*, 359 Md. at 282, 753 A.2d at 525.

## A. Sirbaugh

 The trial judge concluded that Sirbaugh's testimony at the motion to suppress hearing was inconsistent and discounted it. Taking the evidence in the light most favorable to the State, with due regard for the trial judge's determination regarding the credibility of the witnesses before him, we shall focus on the testimony of the police officers, who the trial judge apparently found credible. Officer Thorn testified that he informed Sirbaugh that the prosecutor would be made aware of his cooperation. The question before us is whether this was an improper inducement.

Officer Thorn's statement was not a promise of help or special consideration because he had no discretion regarding such matters. Police officers, however, bear a professional duty to inform the prosecutor truthfully of the circumstances surrounding the investigation of a case so that the prosecutor is not surprised at trial. One of the relevant issues at trial, and therefore of interest to the prosecutor in preparation for trial, is the conduct of the defendant during any custodial interrogation. Because police officers always have a duty to

*Winder*, 362 Md. at 320, 765 A.2d at 122.

relate truthfully to the prosecutor the events that occur during custodial interrogation, a promise to a suspect that the interrogator truthfully would inform the prosecutor that the suspect either did or did not cooperate is not a promise of special advantage, in our view.

Officer Thorn's alleged "promise" was not contingent on whether Sirbaugh confessed. Officer Thorn told Sirbaugh that he would inform the prosecutor of how the interrogation went, including whether Sirbaugh cooperated. This communication would occur regardless of Sirbaugh's conduct—the only difference being the content of Officer Thorn's report to the prosecutor. This is nothing more than the routine report that officers generally give to prosecutors. There was no special consideration because Sirbaugh was to be treated exactly as any other suspect would be treated.

Those statements that have been held to be improper inducements have involved promises by the interrogating officers either to exercise their discretion or to convince the prosecutor to exercise discretion to provide some special advantage to the suspect.[14] Officer Thorn offered no special advantage, did not promise to exercise any discretion, nor did he promise that the prosecutor would exercise any discretion in favor of Sirbaugh.

Because there was no improper inducement in this case, there is no need to engage in step two of the *Hillard* test. The trial court did not err in denying the suppression motion or admitting Sirbaugh's confession as evidence at trial.

## B. Knight

The preceding analysis applies to Detective Buie's statement to Knight that Knight's cooperation would be "help-

---

**14.** "I can make you a promise, okay? I can help you. I could try to protect you." *Winder*, 362 Md. at 289, 765 A.2d at 104. "[P]roduce the narcotics, [and your] wife [will] not be arrested." *Stokes v. State*, 289 Md. 155, 157, 423 A.2d 552, 553 (1980). "[I]f you are telling me the truth … I will go to bat for you." *Hillard*, 286 Md. at 153, 406 A.2d at 420. "[I]t would be better for [you] if [you] made a statement because if [you] did they would try to get [you] put on probation." *Streams*, 238 Md. at 281, 208 A.2d at 615.

ful." That statement was not an improper inducement. Detective Buie's statement to Knight, "if down the line, after this case comes to an end, we'll see what the State's Attorney can do for you, with your case, with your charges," however, was clearly a promise to exercise advocacy on Knight's behalf to convince the prosecutor to exercise discretion in Knight's favor. This statement is very similar to the statements that have been held to be improper inducements. *See* note 14, *supra.*

█ Having found that the promise to aid Knight "down the line" was an improper inducement, we move to step two of the *Hillard* test, the reliance or nexus analysis. Knight made two statements to police officers on 8 June 2000. The statement presented to the jury at trial [15] was the second of the two. That statement was recorded in the Homicide Division after the improper inducement was made. The first statement, given to Detective Sergeant Massey at the Western District Criminal Investigations Division Office prior to Detective Buie's involvement in the interrogation, preceded the improper inducement. According to Detective Sergeant Massey, the first statement contained "the exact information" Knight provided in his recorded statement at the Homicide Division. Knight did not attempt to impeach or contradict this assertion at either the suppression hearing or at trial.

The improper inducement obviously could not have caused Knight to make the first statement. Giving due credit to Detective Sergeant Massey's testimony,[16] it follows that the

---

**15.** The audiotape recording of the statement was played for the jury and a printed transcript was provided to each jury member so that they could follow along with the tape. The record indicates that the printed transcripts then were collected from the jury before it retired to deliberate.

**16.** As with Sirbaugh, we consider the evidence in a light most favorable to the State, giving due regard to the trial judge's determination regarding the credibility of the witnesses before him. The trial judge apparently discounted Knight's testimony, but found the police officers to be credible. Accordingly, we focus our analysis on the testimony of the police officers.

improper inducement could not have caused Knight to make the second identical statement either. If Knight needed no improper inducement in order to give the first statement, then it is reasonable to conclude that there was no nexus between, or reliance on, the improper inducement in his repetition of the substantive content of the former statement.

The record indicates that Knight's goal in giving both statements was to shift blame from himself. He named in both Ralph Williams as the shooter and Antonio Jones as the man who accompanied Williams from the "hack" to the scene of the robbery. The part of Knight's stories regarding Antonio Jones was a lie. As was subsequently discovered by the authorities, Jones was in prison at the time and could not have been involved. Knight's lie indicates a calculating, though doomed, attempt to shift the guilt to others. That, and not the hope of special treatment from the interrogating officers or prosecutor, motivated Knight when he gave his statements. It is ironic that in trying to place the blame on a man who could not have been involved in the crime, Knight gave the State its strongest evidence linking him to the conspiracy, robbery, and murder.

We conclude that, when viewed in the light most favorable to the State, the evidence that Knight gave his first statement prior to the improper inducement and that the two statements were identical in substantive content was sufficient to support the hearing judge's finding, by a preponderance of the evidence, that Knight's recorded statement was admissible, untainted by the inducement. The trial court did not err in denying the suppression motion or admitting Knight's statement as evidence at trial.

*JUDGMENTS AFFIRMED, WITH COSTS.*