879 A.2d 1074

**Shanquon Kenny TAYLOR**

v.

**STATE of Maryland.**

**No. 140, Sept. Term, 2004.**

Court of Appeals of Maryland.

Aug. 10, 2005.

386

Brian L. Zavin, Asst. Public Defender (Nancy S. Forster, Public Defender, Baltimore), on brief, for petitioner.

Kathryn Grill Graeff, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, and Alicia B. Williams, Staff Attorney, Baltimore), on brief, for respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

WILNER, J.

On what was labeled an Agreed Statement of Facts, petitioner, Shanquon Taylor, was convicted in the Circuit Court for Prince George's County of second degree rape and second degree assault and sentenced to an aggregate of seven years in prison, all but three years of which was suspended. The Court of Special Appeals affirmed the judgment, and we granted *certiorari* to consider three issues: (1) whether the trial court acted properly in rendering a verdict on what was actually a statement of stipulated evidence that contained a significant dispute of material fact requiring, for its resolution, credibility determinations; (2) whether a statement made by Taylor to the police that was referenced in the statement of stipulated evidence was involuntary under Maryland common law and should have been suppressed; and (3) whether that statement to the police was also inadmissible under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). It will not be necessary for us to reach the third issue, which was neither raised nor decided in the Circuit Court.

## BACKGROUND

### The Incident and Arrest

On June 1, 2002, just a few weeks after they first met, Taylor and Ms. Carter made a date to go to a movie at Iverson Mall. When it turned out that Taylor did not have sufficient funds to purchase two tickets, they opted to go instead to Taylor's apartment and watch a movie on video. At the time, Taylor, 19 years old, was under the care and custody of the Department of Social Services and was living in a group home as part of his participation in a counseling program known as Take Charge.[1] While at the apartment, petitioner

---

1. It was later proffered by defense counsel that, at the age of 17, Taylor had been declared a child in need of assistance, which accounted for

and Ms. Carter engaged in sexual intercourse. The circumstances under which that occurred were in dispute—Taylor claimed that it was, eventually, consensual, whereas Ms. Carter claimed that she was raped.

Upon leaving the apartment, Ms. Carter called 911 and reported that she had been raped. Presumably in response to that report, Detective Schreiber, several days later, went to Taylor's apartment to investigate, but Taylor apparently refused to speak with him or accompany him to the police station.[2]

About a week after that incident, Taylor left the group home (and the Take Charge Program) and went to live with an uncle in North Carolina. On June 16, 2002, a warrant was issued for his arrest. At some point in late July, Taylor was arrested in North Carolina—apparently for an incident that occurred there—and, on August 3, 2002, upon discovery of the Maryland warrant, he was transported by car from North Carolina to the police station in Prince George's County, a trip that took between seven and eight hours, during which he was given nothing to eat or drink.

### The Interview and Statement

Upon arrival, around 5:30 p.m., Taylor was given food and drink and then was interviewed by Detective Schreiber. The four-hour interview was videotaped. The backdrop of the interview and the arrest warrant that triggered it was Ms. Carter's complaint that the sexual intercourse was not consen-

---

his commitment to the Department of Social Services and his residence in a group home. The Take Charge Program is apparently a county-based counseling program. Both Taylor and his mother had a number of unspecified mental health problems; there was evidence that Taylor had been hospitalized for mental health problems on three occasions prior to the trial. Indeed, his first response to the indictment returned against him was a plea of not criminally responsible and not competent to stand trial.

2. In a statement given later to Detective Schreiber, Taylor claimed that, as he had promised, he went to the station several hours later, accompanied by his counselor, and was told that Schreiber was not there.

sual but was committed against her will and upon Taylor's threat that he had a weapon, coupled with Taylor's alleged acknowledgment to three of his counselors that he had engaged in "sex" with a woman and had forcibly prevented her from leaving his apartment. After some preliminary questions, Schreiber gave Taylor the *Miranda* advice and warnings. The first warning was the right to remain silent. In that regard, Schreiber said:

> "If you choose to give up that right anything you say can be used against you in court. Now, this sort of has I think bad wording, okay, but it says it can be used against you in court, *but anything you say also can be used for you in court because I don't really try to take sides.* Okay?

(Emphasis added).

After completion of the advice of rights, Taylor acknowledged that he had not been promised anything or threatened in any way and that he was not under the influence of drugs or alcohol. Following a short break, Taylor inquired when his "court date" would be. Schreiber responded that he did not know, but advised that "after we speak or don't speak or whatever goes I'll walk you back over to the commissioner's office. You'll have a hearing in front of the commissioner in reference to the charges, and then the commissioner will look at your record." Schreiber explained that the commissioner would decide whether Taylor would be released on his own personal recognizance, have to post bond, or be denied bond and that, if he had to post bond, he would be transferred to the county jail, at which point he could contact friends or relatives to come and post bond. Schreiber informed Taylor that, if he was not released, he would appear before a judge on Monday (the interview took place on Saturday) for a bail review. When asked by Taylor what he thought would happen—whether the commissioner might release petitioner until his trial date—Schreiber said that he did not know, that there were lots of commissioners and they reach different decisions. He added:

> "Okay. But there's nothing that—you know, we speak and you're pretty forthright and you're pretty truthful to me *I*

*can always make a recommendation to the commissioner,* you know, say Mr. Taylor was pretty cooperative with me this evening, you know, he didn't give me any trouble, *and then that can assist them in making whatever decisions they make.* Okay?

So, you know, I mean, if you—and I don't have any problem doing that, okay, but if you get in here and you jerk me around and you pull my leg and I know you're lying to me, you know what I mean, then I'm not going to—I wouldn't say anything to him at all. Okay?"

(Emphasis added).

At that point, Schreiber began asking Taylor about what occurred. Taylor said that when they got to his apartment, they went into his bedroom, sat on the bed, and engaged in "small talk." At some point, he began rubbing her arm. After a bit, Ms. Carter got up, went to the mirror to fix her hair, and pulled up her skirt, exposing her "butt." At petitioner's request, she did that again and then got back on the bed. Taylor hugged her, and they laid down face to face and continued talking. Taylor told her that he wanted to have sex, but she declined and then asked if he was angry. He said that he was not and that he wanted her to stay, so she got back on the bed. They gave each other back massages, but she again declined Taylor's invitation to have sex. Taylor, believing that she was teasing him, was annoyed and sat up on the bed.

At that point, according to Taylor, she changed her attitude. She said "come on" and "pulled down her drawers, honest to God, pulled down her drawers, lifted up her skirt, lifted her legs over, laid on the bed like this (indicating). She was like hurry up. She like you got a condom. I was like yeah. She like hurry up." Taylor added:

"I was like I ain't going to have sex with you with that attitude. She was like come on, come on. I'm like all right. And then all of a sudden when I was having sex with her like—I'd say like a couple of minutes into it then she said—then she was looking at me and she was like boy, hurry up.

I was like damn, why you got to be all aggressive, and then she looked at me and as soon as I finished I pulled out. Even though I had a condom on I pulled out and then she looked at me and she said you know this is rape. I was like huh."

According to Taylor, Ms. Carter pulled up her drawers, pulled down her skirt, got her pocketbook, and left. Taylor got dressed and followed her, asserting that "I didn't rape you." He walked her to a bus stop and she finally said that everything was all right—"It's all good. It's cool."

Schreiber then wanted Taylor to put his statement in writing and, after some reluctance on Taylor's part, he was able to persuade Taylor to do so. Taylor asked to be taken to the commissioner on several occasions, but Schreiber stressed the importance of having the statement in writing. Before proceeding with a written statement, Taylor twice revisited the prospect of Schreiber's assisting him with the commissioner. He first asked, "[i]f the commissioner does decide—if you put in a good word for me and the commissioner does decide to let me go will you take me to the metro station if he decided to let me go," to which he did not get a clear reply. He then asked "[i]f I do this and everything be straight can you talk to him for me, man, for real," to which Schreiber responded, "You know, like I say, so long as you're straight for me, okay, then I'll talk to the commissioner and just say—let the commissioner know that you cooperated and, you know, that's the most the police can do." He added, "I can't say let him go. I can't—that's not up to the police. Okay. So, you know, I know you want to go home. I can tell that. Okay. You know, I just want to make sure you get the opportunity to . . . tell your side of the story, okay, and, you know, we'll go from there." Taylor then gave a written statement which, after further questioning regarding it, he signed.

### Further Proceedings

The record is not entirely clear with respect to the next succeeding events. There is some evidence that, upon being presented before the commissioner on August 3, Taylor was

charged with first degree rape, denied bond, and committed to jail pending a trial on September 30, 2002. On that day, the case was nol prossed and he was released. Detective Schreiber immediately filed a new Statement of Charges, however, and Taylor was promptly re-arrested. A seven-count indictment was returned on October 22, 2002, charging first and second degree rape, third and fourth degree sexual offense, first and second degree assault, and false imprisonment.

Taylor moved to suppress the statement he had given. Although the videotape of the four-hour interview was admitted into evidence at the suppression hearing, it was not played in full and no transcript was then available, so Detective Schreiber was forced to rely on his memory.[3] He was questioned at some length about what he told Taylor regarding the commissioner, and, although conceding that he usually will tell the commissioner if a defendant is truthful and cooperative, he denied leading Taylor to believe that he would help him if Taylor told his side of the story.

Taylor's attack on the voluntariness of the statement was based primarily on his allegedly fragile mental state, coupled with the fact that the interview occurred on the heels of a seven or eight hour trip from North Carolina during which he had nothing to eat or drink. Only in passing did defense counsel complain as well that Schreiber said that he "may go to the commissioner and implied that there was a possibility, although we all know it wasn't a possibility, that Mr. Taylor would go home from there and not go to the correctional center." At no point did counsel complain about, or even mention, Schreiber's statement, in reciting the *Miranda* warnings, that anything said by Taylor could be used *for*, as well as *against*, him in court. The court accepted Schreiber's testimony that he merely explained the various options open to the commissioner, one of which, however unlikely, would be to release Taylor. Looking at the totality of the circumstances,

---

**3.** By consent of the parties, the transcript was added to the record when the case was pending in the Court of Special Appeals, to avoid the court having to resort to the four-hour videotape.

the court concluded that Taylor was properly advised of his rights, that he voluntarily waived those rights, and that the statement was admissible. Presumably because counsel never raised the issue, the court made no specific ruling on whether the *Miranda* warnings were compromised because of Schreiber's statement that anything said by Taylor could be used for or against him.

The lingering, and really predominant, issue raised by Taylor was whether he was competent to stand trial, and, when the court found that he *was* competent, the prosecutor and defense counsel signed a document entitled "Agreed Statement of Facts," which, in fact, was not an agreed statement of facts. It was, instead, a recitation of Ms. Carter's version of the event and a statement, captioned "Additional facts," that contained some statements of fact, some statements of what Taylor had told three of his counselors, and some of what he had said in his written statement.

The first part of the document was captioned "According to Carter." In that part, the document stated that Ms. Carter agreed to go to Taylor's apartment to watch videos, that for about an hour they talked and watched videos, that during that time, Taylor began kissing Ms. Carter and slowly pushed her down onto the bed, that she asked him to stop but that he forcibly pushed her on the bed and continued to kiss and fondle her, and that she ran into the bathroom hoping to cool his ardor. When she returned from the bathroom, Taylor continued his attempt to have sexual intercourse, and again she demurred, telling him that she was menstruating and had not known him long enough to sleep with him. The statement continued that Taylor became angry, implied that Ms. Carter was a female impersonator, and said that she could not leave until she proved that she was not a man.

According to Ms. Carter, Taylor went to his closet, reached in, and implied that he had a weapon by placing a towel over his hand and saying it was a gun. She was in fear of immediate harm. He then forced her to have vaginal intercourse, against her will and without her consent, for about six

to seven minutes, during which time she continued to resist. They then got dressed and left the apartment together. Taylor told her that he was part of a "mob" and would hurt her and her son if she told anyone what had occurred.

In the "Additional facts" section, the document recited that Taylor had been living in a group home and that, on June 3, 2000—two days after the incident—he told three of his counselors that he was not returning to the group home, that he had been with a woman who refused his advances, that she tried to leave, and that "he forcibly prevented her from leaving and that he had sex with her." The document then recounted that, on August 3, 2002, Taylor was brought by North Carolina sheriffs to Prince George's County, that the trip took seven to eight hours during which Taylor was given nothing to eat or drink but that he was given food and drink prior to his interrogation by Detective Schreiber. The statement continued, in relevant part:

> "Schreiber had Taylor sign and waive his Miranda rights, talk with him and write a statement where he wrote and said that he had consensual sexual intercourse with Carter. In his written statement, Taylor acknowledged that Carter had said she had been raped. He wrote 'I brought up the subject about sex she said no so I let it go and set up on the bed. And she ask me was I mad at her I said no. So time went by and I brought It up again about sex, she said no again, so she ask was I mad. I said no, so she said boy come on and heary up [sic]. So I went to get a condom and when I came back we did it, had sex. And after sex she said boy you rape me.'"

That document was the only evidence presented to the court.[4] Everyone recognized that the agreed statement went only to Counts 2 through 7 of the indictment and did not pertain to the first degree rape charge in Count 1, which was eventually nol prossed. During argument, defense counsel

---

4. At one point, the State suggested that the videotape should be part of the evidence but later withdrew that request.

conceded second degree assault.[5]   The court recognized the unusual posture of the case—a supposed agreed statement of facts "where you have a complainant that says one thing and a defendant that says another thing" and that "[c]ritical to that determination is obviously the fact-finder's opportunity to observe the demeanor of that witness and obviously make a determination based on those observations; whether, one is more credible than the other."   It added that it was presented "remarkably, with a two-page statement that I'm supposed to glean from this two-page statement who might be telling the truth and who might not be telling the truth."   Nonetheless, the court concluded that Ms. Carter's version, corroborated by Taylor's admission that he did, indeed, have sexual intercourse with her, sufficed to establish both second degree rape and second degree assault.   The second degree assault, founded on the forcible push to the bed, was based as well on counsel's concession as to that charge.   The court found Taylor not guilty of the other remaining charges—third and fourth degree sexual offense, first degree assault, and false imprisonment.

Taylor appealed to the Court of Special Appeals, complaining, among other things, that (1) the trial court erred in convicting him based on an agreed statement of facts that left material facts in dispute, and (2) his statement to Detective Schreiber should have been suppressed because (i) Schreiber's advice that anything Taylor said could be used for, as well as against, him constituted a violation of *Miranda*, and (ii) Schreiber's offer to make a recommendation to the commissioner if Taylor cooperated constituted an improper inducement that made the statement involuntary.   In an unreported opinion, the intermediate appellate court affirmed.

As to the alleged Agreed Statement of Facts, the court recognized that the document was actually in the form of stipulated evidence.   Rather than focusing on the clear conflict as to whether the admitted sexual intercourse was consensual,

---

**5.**   Her statement was "I believe we would concede Count 6, which is second degree assault.   I will submit on that."

however, the court looked only to see if "the evidence present-
ed" in the document "was adequate to support the court's
findings," and concluded that it was sufficient. With respect
to the alleged *Miranda* violation, although the State quite
properly pointed out in its brief that that issue had not been
raised or decided in the Circuit Court, the court addressed it
anyway and found that there was no prohibition against the
police informing suspects that their statements could be used
for or against them, so long as that advice does not rise to the
level of an improper promise or inducement. Finally, in
dealing with the inducement complaint, the court held that,
because it is permissible for commissioners to consider a
defendant's cooperation with the police in determining pre-
trial release, it was not an improper inducement for Schreiber
to state that he would inform the commissioner of Taylor's
cooperation.

## DISCUSSION

### The Agreed Statement of Facts

In *Barnes v. State*, 31 Md.App. 25, 35, 354 A.2d 499,
506–07 (1976), the Court of Special Appeals explained the
nature of and distinctions between two devices frequently used
in Maryland courts to dispense with the calling of witnesses at
trial—an agreed statement of facts and a statement of stipu-
lated evidence. This Court, on several occasions, has quoted
and approved that analysis. In *Bruno v. State*, 332 Md. 673,
689–90, 632 A.2d 1192, 1200 (1993), quoting *Barnes*, we said, in
pertinent part:

" 'There is a distinction between an *agreed* statement of
facts and evidence offered by way of stipulation. Under an
agreed statement of facts both [the] State and the defense
agree as to the ultimate facts. Then the facts are not in
dispute, and there can be, by definition, no factual conflict.
The trier of fact is not called upon to determine the facts as
the agreement is to the truth of the ultimate facts them-
selves. There is no fact-finding function left to perform.

To render judgment, the court simply applies the law to the facts agreed upon....

On the other hand, when evidence is offered by way of stipulation, there is no agreement as to the facts which the evidence seeks to establish. Such a stipulation only goes to the content of the testimony of a particular witness if he were to appear and testify. The agreement is to what the evidence will be, not to what the facts are. Thus, the evidence adduced by such a stipulation may well be in conflict with other evidence received. For the trier of fact to determine the ultimate facts on such conflicting evidence, there must be some basis on which to judge the credibility of the witness whose testimony is the subject of the stipulation, or to ascertain the reliability of that testimony, to the end that the evidence obtained by stipulation may be weighed against other relevant evidence adduced....' "

See also *MVA v. Karwacki,* 340 Md. 271, 286–87, 666 A.2d 511, 518–19 (1995), *Atkinson v. State,* 331 Md. 199, 203 n. 3, 627 A.2d 1019, 1020–21 n. 3 (1993), *Covington v. State,* 282 Md. 540, 541–42, 386 A.2d 336, 337 (1978).

*Barnes* illustrates quite well the problem here. The defendant, charged with shoplifting a bag of sugar at a grocery store, agreed to proceed on a statement of stipulated evidence. The prosecutor then proffered that a security person would testify that he observed the defendant, while standing in the cashier's line, place a box of sugar in her purse, close the purse, and not pay for the sugar. After adding one fact not germane to guilt or innocence, defense counsel moved for acquittal, arguing that the defendant had not formed the intent to steal at the time the officer accosted her. In the course of the argument, counsel proffered that, if the defendant were called to testify, she would state that her purse was open at all times, that the sugar remained visible, that she was arrested while she was still in the line and before she had an opportunity to pay, and that she intended to pay for the sugar and had the funds to do so. Notwithstanding that additional proffer, the trial court rendered a verdict of guilty.

The Court of Special Appeals reversed. It noted the obvious—that there was evidence sufficient to show that Barnes had concealed the sugar and evidence sufficient to show that she had not, and that, in declaring her guilty, the court necessarily rejected her version of the event. The appellate court concluded, however, that "there was no proper basis on which the court could resolve the conflict" in that "neither the State's evidence nor the defense's evidence was inherently incredible." *Barnes, supra,* 31 Md.App. at 34, 354 A.2d at 505. Thus:

"As we see it, in the circumstances, the only way the court could have resolved the conflict in the evidence, and made a factual finding that the merchandise was concealed, was by arbitrary choice. We believe a choice so made to be capricious, and a determination of guilt beyond a reasonable doubt may not be properly bottomed on it. Therefore, the judgment of the court was clearly erroneous, and we shall reverse it."

*Id.* at 34–35, 354 A.2d at 505. *See also Polk v. State,* 85 Md.App. 648, 584 A.2d 1274 (1991).

Although this Court has not, until now, had a case so close in point to *Barnes,* we have, as noted, quoted and cited *Barnes* with approval on several occasions. In *Atkinson v. State,* 331 Md. 199, 203 n. 3, 627 A.2d 1019, 1021 n. 3 (1993), we made clear that, although the procedure of having all of the evidence presented through stipulation may be appropriate "when the parties sought to argue solely legal issues at trial," it "should not be used when there are significant witness credibility questions." We add now, not just that the process "should not be used" when there are material disputes of fact that hinge on credibility determinations, but that it *may not* be used in that circumstance. The *Barnes* court was correct in its observation that, where (1) material evidence is in conflict, (2) resolution of that conflict depends on a determination of the credibility of the witnesses through whom the conflicting evidence is presented, and (3) there are no factors apparent in the record that would enable a finder of fact reliably to judge the credibility of the witnesses, any determi-

nation made by the trier of fact is necessarily arbitrary and cannot stand.

That is precisely what occurred here. In order to justify a finding of second degree rape, the evidence had to show, beyond a reasonable doubt, that Taylor engaged in vaginal intercourse with Ms. Carter by force or threat of force and without her consent.[6] *See* Maryland Code, § 3–304 of the Criminal Law Article. Had the Agreed Statement of Facts consisted only of Ms. Carter's version, it would have sufficed, but once Taylor's version, presented as "Additional facts," was added, a conflict was created as to whether the sexual intercourse was committed with force or threat of force and without Ms. Carter's consent. It was not, as the Court of Special Appeals supposed, a matter of examining whether the evidence most favorable to the State was legally sufficient to establish those required elements—clearly it was—but rather of determining whether, in light of Taylor's assertion that "he had consensual sexual intercourse with Carter," that evidence could be credited without the opportunity to make a reasoned determination as to the respective credibility of Ms. Carter and Mr. Taylor. It clearly could not be.

Counsel, by now, should realize that criminal cases cannot be resolved on the basis of stipulated evidence that embodies disputes of material fact resolvable only by credibility determinations, when there is nothing in the stipulated evidence that would allow the court, properly, to make such determinations. Should such a procedure be presented, the court must reject it as inappropriate.

### *Taylor's Statement*

In light of our holding as to the Agreed Statement, the verdicts rendered below cannot stand. The deficiency is not one of legally insufficient evidence, however, but rather one of trial error—the procedure used to determine guilt. The case

---

6. The crime may also be committed if the victim is mentally defective or incapacitated, physically helpless, or under the age of 14, but none of those circumstances were alleged.

must therefore be remanded for new trial. Should the State wish to proceed, the issue of Taylor's statement to Detective Schreiber will likely arise again, and, as that issue was raised and decided in both the Circuit Court and the Court of Special Appeals and was included in the petition for *certiorari*, we shall address it, or at least one part of it. Because, unlike the two lower courts, we believe that Detective Schreiber did offer an improper inducement that was relied on by Taylor, we shall hold the statement to be involuntary under Maryland common law, and, as that will preclude its use in any retrial, we need not address the *Miranda* issue that was never raised or decided in the Circuit Court and should not have been addressed by the Court of Special Appeals.[7]

Although, to the extent that Taylor repeatedly claimed that the sexual encounter was consensual, his statement was largely exculpatory, it was partly inculpatory as well. He not only conceded that he had engaged in vaginal intercourse with Ms. Carter on the day and at the place she alleged—a critical element of the offense—but, on the issue of consent, he acknowledged as well that (1) she initially resisted his efforts, and (2) she *immediately* claimed that what had occurred was rape. His complaint—that he was induced first to recite and then to put in writing that statement by Detective Schreiber's promise to intercede or make a recommendation to the commissioner with respect to pre-trial release—needs to be resolved.

In *Hillard v. State*, 286 Md. 145, 153, 406 A.2d 415, 420 (1979), this Court, distilling earlier decisions dating back to *Nicholson v. State*, 38 Md. 140, 153 (1873), made clear, as a matter of Maryland common law, that "if an accused is told, or it is implied, that making an inculpatory statement will be to his advantage, in that he will be given help or some special consideration, and he makes remarks in reliance on that

---

7. We have long avoided addressing Constitutional issues when it is not necessary to do so, and it is now clear that the requirements of *Miranda* are of Constitutional dimension. *See Dickerson v. United States*, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).

inducement, his declaration will be considered to have been involuntarily made and therefore inadmissible." We have confirmed that principle on many occasions since *Hillard. See Reynolds v. State,* 327 Md. 494, 508–09, 610 A.2d 782, 789 (1992); *Ball v. State,* 347 Md. 156, 174–75, 699 A.2d 1170, 1178 (1997); *Winder v. State,* 362 Md. 275, 308–09, 765 A.2d 97, 115 (2001); *Williams v. State,* 375 Md. 404, 429, 825 A.2d 1078, 1093 (2003); *Knight v. State,* 381 Md. 517, 533–34, 850 A.2d 1179, 1188–89 (2004).

As we pointed out in *Winder, supra,* 362 Md. at 309, 765 A.2d at 115, *Hillard* embodies a two-prong test: (1) did the officer "promise[ ] or impl[y] to a suspect that he or she will be given special consideration from a prosecuting authority or some other form of assistance in exchange for the suspect's confession," and (2) did the suspect "make[ ] a confession in apparent reliance on the police officer's statement." Although both prongs must be satisfied before an inculpatory statement may be held to be involuntary, the State has the burden of showing that an inculpatory statement is voluntary—that it was "not made in reliance on a promise or inducement made by a police officer or agent of the police." *Id.* at 310, 765 A.2d at 116. We also confirmed in *Winder* that, because the issue of voluntariness is a mixed one of law and fact, we undertake a *de novo* review of the trial judge's ultimate determination. *Id.* at 310–11, 765 A.2d at 116.

Circumstances analogous to those here were presented in *Knight v. State,* 381 Md. 517, 850 A.2d 1179 (2004). *Knight* actually involved two separate cases that were consolidated on appeal, *Knight v. State* and *Sirbaugh v. State,* and our disposition of those cases points the way to the conclusion in this case. In *Sirbaugh,* the suspect was informed by the police, during a custodial interrogation, that the officers would inform the State's Attorney " 'that when we asked a question he answered it.' " We held that such a commitment did not constitute an improper inducement sufficient to render his ensuing inculpatory statement involuntary. We pointed out that the officer's statement was "not a promise of help or special consideration because he had no discretion regarding

such matters"—that police officers had "a professional duty to inform the prosecutor truthfully of the circumstances surrounding the investigation of a case so that the prosecutor is not surprised at trial." *Knight, supra,* 381 Md. at 535, 850 A.2d at 1190.

In Knight's case, we reached a different result. The police there told the suspect not only that his cooperation " 'would be helpful' " and that the State's Attorney would be informed of his cooperation, but that " 'down the line, after this case comes to an end, we'll see what the State's Attorney can do for you, with your case, with your charges.' " *Id.* at 522, 850 A.2d at 1182. The latter commitment, we held, crossed the line; it was "clearly a promise to exercise advocacy on Knight's behalf to convince the prosecutor to exercise discretion in Knight's favor." *Id.* at 537, 850 A.2d at 1190. In the end, we affirmed Knight's conviction because we were unable to conclude that the improper commitment actually induced the statement Knight sought to suppress.[8]

In this case, as a backdrop to both prongs of the *Hillard* test, we note that Taylor was a 19–year–old youth with apparent, though unspecified, mental problems, who had just been subjected to a seven-to-eight hour drive by North Carolina sheriffs, without food or drink, who said that he was tired and wanted very much to go home. He made that point clear to Detective Schreiber several times—that he was hoping to be released by the commissioner until his trial date. Detective Schreiber knew, and later acknowledged, that, with Taylor facing charges of first degree rape and first degree assault involving the alleged use of a weapon, it was extremely unlikely that he was going to be released by the commissioner. Nonetheless, in response to Taylor's attempt to connect his

---

**8.** Knight had given a prior statement, free of any improper inducement, that contained the same information as the second. We thus held that "[i]f Knight needed no improper inducement in order to give the first statement, then it is reasonable to conclude that there was no nexus between, or reliance on, the improper inducement in his repetition of the substantive content of his former statement." *Id.* at 538, 850 A.2d at 1191.

cooperation with Schreiber to the prospect of his being released, Schreiber not only laid out the various options available to the commissioner, including release, as though all were equally possible, but he went on to offer the prospect of his making a recommendation to the commissioner "that can assist them in making whatever decisions they make." That offer, to make a recommendation that can assist the commissioner in deciding whether to release Taylor, was tied tightly to Taylor's "being cooperative with me this evening" and clearly constituted an improper inducement—an implication that, if he cooperated by giving a statement of his version of the event to Detective Schreiber, he would be given help with the commissioner.

Unquestionably, the reliance prong was satisfied here. Taylor refrained from giving an oral statement and resisted later giving a written one until after being assured that Schreiber would intercede with the commissioner. Both he and Schreiber continually tied his making a statement to what the commissioner might do. The resulting statements, therefore, were involuntary and, for that reason, inadmissible.

**JUDGMENT OF COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AND REMAND THE CASE TO THAT COURT FOR A NEW TRIAL; COSTS IN THIS COURT AND IN COURT OF SPECIAL APPEALS TO BE PAID BY PRINCE GEORGE'S COUNTY.**