920 A.2d 1

Tyshawn JONES

v.

STATE of Maryland.

No. 0540, Sept. Term, 2005.

Court of Special Appeals of Maryland.

March 29, 2007.

432

434

Paul A. Allulis, Rosemary E. Allulis, Towson, for appellant.

Celia A. Davis (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Panel DAVIS, KRAUSER and SHARER, JJ.

SHARER, J.

Appellant, Tyshawn Jones, was convicted by a jury, in the Circuit Court for Washington County, of first-degree felony murder, depraved heart second-degree murder, conspiracy to commit armed robbery, armed robbery, and numerous other related and lesser-included offenses. Appellant received a total executed sentence of life in prison (for the first-degree felony murder), plus 35 years.

In his timely appeal, Jones presents five issues for our review, which, as slightly rephrased, are:

1. Whether the circuit court committed reversible error in allowing appellant's May 4, 2004 statement into evidence.

2. Whether the evidence was sufficient to sustain the conviction for armed robbery.

3. Whether the evidence was sufficient to sustain the conviction for conspiracy to commit armed robbery.

4. Whether the evidence was sufficient to sustain the conviction for first-degree felony murder.

5. Whether the circuit court committed reversible error by not polling or hearkening the jury before the jurors were discharged.

For the reasons that follow, we shall reverse the conviction for first-degree felony murder. Also, we shall hold that the

verdicts were not perfected as a result of the lack of polling and hearkening, and remand for a new trial.

## BACKGROUND

The events of March 13, 2004, which were the genesis of this prosecution, are largely undisputed. Thus, we shall recount only those facts germane to the issues on appeal. All of the events described occurred in Washington County.

### The Crimes

On the evening of March 13, 2004, appellant was dropped off at the Washington Garden Apartments to attend a party. When he arrived, appellant met his friend, Tione Blake ("Blake"), and, among others, Azaniah Blankumsee ("Blankumsee"), with whom appellant had not previously made acquaintance. Appellant stayed in the parking lot of the apartment complex throughout the evening with some young women he met there.

At some time during the evening, Blankumsee put a .380 caliber pistol to the head of one of the partygoers, but left the party without making harmful use of the gun. Later, outside the apartment, Blake, accompanied by a group of about ten people, approached another partygoer, Andrew Snyder. Blake put a .22 caliber pistol to Snyder's side and robbed him of approximately eight dollars. Snyder then went back inside to tell those in the apartment that he had been robbed.

Apparently intending to recover Snyder's money, a crowd left the apartment about five minutes later to confront Blake, Blankumsee, and two others. The crowd from the party, including Jonathan Dennis, followed Blankumsee, Blake, and their companions, who were returning to their cars. Appellant was still in one of the cars "socializing" with two young women. As the crowd approached, Blankumsee pointed the .380 caliber gun at the crowd. Jonathan Dennis threatened Blankumsee, who then began firing the weapon. Appellant grabbed a .22 caliber pistol from Blake and began to shoot over the heads of the crowd. One of the bullets did not find a

safe path, however, and Jonathan Dennis was hit with a single .22 caliber round. The wound was fatal, and Dennis died at the scene. Appellant and the others fled the scene before police arrived; therefore, no arrests were made at that time.[1]

### Appellant's Arrest

On March 17, 2004, appellant was arrested in an unrelated matter after he was found hiding in Antietam Creek. In the creek nearby, police found a .22 caliber pistol. It was later determined, through forensic examination, that the shot that killed Jonathan Dennis was fired by the pistol found in the creek near the location where appellant was found. Thus, police were motivated to question him about his knowledge of Dennis's murder. Appellant voluntarily went to the Hagerstown City police station on March 22, 2004, to give a statement. He was interrogated by Detective Christopher Kayser of the Hagerstown Police Department and Assistant State's Attorney Viki Pauler.

Before questioning commenced, appellant was presented with a letter agreement which promised that, if appellant would speak truthfully with the investigators in connection with their investigation of the shooting of Jonathon Dennis, the State would not prosecute appellant for crimes arising from his possession of the handgun on March 17, 2004. The letter agreement, drafted by Assistant State's Attorney Pauler, and read to appellant, provided:

RE: Investigation of Tione Blake

Dear Mr. Jones:

In exchange for your full and complete cooperation with law enforcement, specifically the Hagerstown Police Department, and the State's Attorney's Office in the above captioned investigation and prosecution, the State declines at

---

1. Blankumsee was also convicted of first-degree felony murder. That conviction was reversed by this Court, which affirmed in all other respects. *Blankumsee v. State,* 169 Md.App. 737, No. 2841, Sept. Term, 2004 (filed August 8, 2006), *cert. denied,* 395 Md. 421 (2006).

this time to proceed with handgun charges against you *stemming from you being in possession of a handgun on Wednesday, March 17, 2004.*

If at any[ ]time during the investigation and prosecution of the above-captioned matter, you fail to cooperate fully or fail to be available to law enforcement or the State's Attorney's Office, this agreement will be void, and the State will proceed criminally against you with any and all possible charges.

(Emphasis added).

The letter was signed by appellant, Assistant State's Attorney Pauler, and witnessed by Detective Kayser. No further explanation was given to appellant, who was not then represented by an attorney. Thereafter, the detective read appellant his Miranda rights and obtained a statement from him.[2]

Appellant was later arrested on yet another unrelated charge and was being held at the Washington County Detention Center. On May 4, 2004, Detective Kayser had appellant transported to the Hagerstown Police Department for further questioning regarding the Jonathon Dennis shooting. When appellant arrived, he was given a drink and some cigarettes and then was read his Miranda rights. Appellant also signed a waiver of rights form. Without mention or discussion of the March 22 letter agreement, Detective Kayser began to question appellant about events of the night of the Dennis shooting. During this interrogation, appellant admitted to being at the Washington Garden Apartments at the time of Jonathon Dennis's death, and to shooting the .22 caliber handgun. He explained that he fired the gun over the heads of the crowd in order to keep the crowd at bay.

Thereafter, appellant was indicted by a grand jury on 36 counts, including those challenged in this appeal: armed robbery, conspiracy to commit armed robbery, and first-degree felony murder. Appellant's motion to suppress both the

---

**2.** Facts later developed revealed appellant's March 22 statement to be untruthful.

March 22 and May 4 statements was heard on October 26 and 27, 2004. The State agreed not to introduce the March 22 statement, but argued that the May 4, 2004 statement was admissible. The suppression court ruled, in an oral opinion, that the May 4 statement was "voluntary . . . and free from coercion and free from lack of due process." A written order to that effect was issued by the court on October 28, 2004.

The charges against appellant were tried to a jury on January 4 and 5, 2005. At trial, appellant sought to re-open the suppression of his May 4, 2004 statement and timely objected to the introduction of the statement into evidence. The court denied suppression and overruled appellant's objection. Appellant was found guilty of the charges that we have noted, *supra*.

As we shall discuss, the jury was discharged without being polled or hearkened. The jurors were reassembled on February 14, 2005, sworn and polled at that time. The polling confirmed that the verdict was unanimous. The circuit court held a sentencing hearing on April 21, 2005, after which appellant filed his timely appeal.

Additional facts will be set forth as they become necessary to our discussion of the issues.

## 1. *Whether the circuit court committed reversible error in allowing appellant's May 4, 2004 statement into evidence.*

Appellant asserts that the circuit court erred by not suppressing his May 4, 2004 statement, arguing that his statement was obtained through illegal inducement. His statement was involuntary, appellant argues, because the March 22 letter was a promise of non-prosecution, and there was a temporal connection between the March 22 letter, and the resulting statement, and the ultimate May 4 statement. Additionally, appellant argues, the May 4 statement was rendered involuntary because the investigator and assistant state's attorney did not advise him that he was not protected from prosecution by the March 22 letter agreement. In short, appellant would

have us impose an affirmative duty upon the interrogating officers to warn him of the non-effect of the letter.

In *Hillard v. State*, 286 Md. 145, 150, 406 A.2d 415 (1979), the Court of Appeals said:

Maryland criminal law requires no confession or other significantly incriminating remark allegedly made by an accused be used as evidence against him, unless it first be shown to be free of any coercive barnacles that may have attached by improper means to prevent the expression from being voluntary.

 When a defendant raises involuntariness as an issue, the State must prove voluntariness beyond a reasonable doubt. *Knight v. State*, 381 Md. 517, 532, 850 A.2d 1179 (2004). Although many factors may be in play in the determination of voluntariness, "a confession that is preceded or accompanied by . . . a promise of advantage will be held involuntary, notwithstanding any other factors that may suggest voluntariness. . . ." *Williams v. State*, 375 Md. 404, 429, 825 A.2d 1078 (2003).[3]

In *Winder v. State*, 362 Md. 275, 309, 765 A.2d 97 (2001), the Court of Appeals articulated a two-part test to determine the voluntariness of custodial statements made under circumstances of alleged inducement through improper promises:

We will deem a confession to be involuntary, and therefore inadmissible, if 1) a police officer or an agent of the police force promises or implies to a suspect that he or she will be given special consideration from a prosecuting authority or some other form of assistance in exchange for the suspect's confession, and 2) the suspect makes a confession in apparent reliance on the police officer's statement.

 "The trial court's determination regarding whether a confession was made voluntarily is a mixed question of law and

---

**3.** Other factors a court may examine are the manner in which an interrogation was conducted, the number of officers present, and the age, education, and experience of the defendant. *Williams, supra*, 375 Md. at 429, 825 A.2d 1078.

fact." *Id.* As such, we review the circuit court's determination on the issue of voluntariness *de novo. Id.* Our review of the denial of a motion to suppress, however, is limited to the record of the suppression hearing. *Id.* at 311, 765 A.2d 97. We will consider the facts, as found by the trial court, in the light most favorable to the State as the prevailing party below. *Knight, supra,* 381 Md. at 535, 850 A.2d 1179 (citing *Cartnail v. State,* 359 Md. 272, 282, 753 A.2d 519 (2000)).

Appellant assigns a temporal connection between the statement he gave the police on May 4, 2004, and the earlier promise made by the State on March 22. Thus, he concludes, the May 4 statement was the product of the promise of non-prosecution made by the Hagerstown Police Department and the State's Attorney's Office on March 22. The letter agreement, he argues, gave him immunity to *all* crimes linked to the .22 caliber handgun.

■ To resolve the effect of the March 22 letter, the suppression court was required to construe it under the totality of the circumstances. In our independent appraisal, we must do likewise. Appellant recognizes, indeed he cannot escape, the letter's specific reference to "all charges against [appellant] stemming from [appellant] being in possession of a handgun *on Wednesday, March 17, 2004.*" (Emphasis added). Clearly, the letter was not an explicit offer not to prosecute appellant for any part in the events of March 13. We conclude, as did the suppression court, that the letter was carefully and precisely drawn and afforded protection to appellant from prosecution of charges arising from his possession of the firearm on March 17, 2004, and nothing more.

The following colloquy between the court and Jones's counsel provides insight into the court's reasoning:

[COUNSEL] [Appellant] was told that he would not be prosecuted for any handgun charges stemming from being in possession of the gun. When you say stemming, it goes out into a broad range of possibilities, to the lay person. And even to me. I'm not really sure what charges stemming from being in possession means.

He was told to be cooperative.

THE COURT: Let's complete it. Complete the sentence.

[COUNSEL]: I'm sorry, your Honor?

THE COURT: Complete the sentence.

[COUNSEL]: "Stemming from being in possession of the handgun on Wednesday, March seventeenth." I still think, I mean he was . . . he admitted to being in possession of the gun, the gun that they knew killed Jonathan Dennis. Now I don't know what all the possibility of charges were but they weren't simply being in possession of a handgun. That's not what it says. It says, "Charges stemming from being possession of a handgun."

THE COURT: "Handgun on Wednesday, March the seventeenth."

We conclude from that exchange that the suppression court chose to construe the letter agreement narrowly, giving due regard to the restrictive language employed. As we consider the wording of the letter, and the plain meaning of the words and phrases employed, we agree with the suppression court's strict construction, and cannot give to it the more expansive reading that appellant presses upon us.

Appellant argues, however, that even if the letter is restricted in its import, he did not understand the agreement because of his lack of intelligence, age, and experience, and because it was not fully explained to him. Thus, he concludes that his interpretation of the letter protects him from prosecution for any crime flowing from his possession of the firearm.

The State first responds that the promise made to appellant on March 22 was not improper because the prosecution had the ability to perform its bargain, and did so. The State's commitment to appellant, therefore, was not a ruse—the State made a promise and kept it, in that appellant was not prosecuted for charges related to his possession of the handgun on March 17, the date he was found in Antietam Creek.

Alternatively, the State argues that, assuming the March 22 agreement reached to the May 4 statement as well,

appellant could not rely upon it because he breached the agreement at the outset. The agreement required appellant's "full and complete cooperation" with the prosecution and the police, and it is clear that appellant was untruthful from the start. At the suppression hearing, appellant testified that, after signing the letter, he lied to the police about his whereabouts on the night of the Dennis shooting. The State argues, reasonably, that appellant's failure to be truthful amounted to a failure to fully cooperate as the agreement required. Even assuming that the State's obligation under the agreement might have extended beyond the events of March 17, we fail to see how appellant, having breached his obligation under the agreement, might now hold the State to its bargain.

Under the first prong of the *Hillard* test, we must determine whether the police made an improper promise, threat, or inducement. *See Knight, supra,* 381 Md. at 534, 850 A.2d 1179. An improper inducement involves a promise by interrogating officers or prosecutors to exercise discretion or to provide some special advantage to a suspect.[4] *Id.* at 536, 850 A.2d 1179. The promise made to appellant in the case *sub judice* was not to exercise discretion or to give some special treatment. Rather, it was a legally binding promise not to prosecute a narrowly defined set of possible charges "stemming from the *possession* of a handgun on *Wednesday, March 17, 2004*." (Emphasis added). The Assistant State's Attorney had the authority to enter into the agreement and the ability to perform. Such a practice—immunity from prosecution for a particular crime in return for information about another—is not uncommon in law enforcement. The tactic is so common, in our experience, that it cannot be said that the promise to appellant was an offer of special treatment. Based upon the

---

4. For examples of improper inducements, *see Knight, supra,* 381 Md. at 537, 850 A.2d 1179 ("[I]f down the line, after this case comes to an end, we'll see what the State's Attorney can do for you, with your case, with your charges."); *Winder, supra,* 362 Md. at 289, 765 A.2d 97 ("I can make you a promise, okay? I can help you. I could help you, I could try to protect you."); *Hillard, supra,* 286 Md. at 153, 406 A.2d 415 ("[I]f you are telling me the truth ... I will go to bat for you ...").

record of the suppression hearing, and considering the totality of the circumstances, we do not find that an improper promise or inducement was made by the State.

Because there was no improper inducement, we need not reach the second prong of *Hillard.* However, it is appropriate to address whether appellant could have relied on the March 22 agreement as an inducement for the giving of his May 4 statement. For this discussion, we shall assume, *arguendo,* that the agreement amounted to an improper inducement. The second *Hillard* prong inquires whether the suspect made a confession in reliance on the inducement. *Winder, supra,* 362 Md. at 309, 765 A.2d 97. "[T]he promise must have caused the suspect to confess." *Reynolds v. State,* 327 Md. 494, 509, 610 A.2d 782 (1992).

Based on the record of the suppression hearing, we cannot discern how appellant could have reasonably relied on the agreement. Even taking into account his claim that his lack of intelligence, age, and experience tends toward involuntariness, we conclude that, under all of the circumstances, his May 4 statement was not tainted by any inducement that may have been made on March 22. Moreover, a holding that he relied on an agreement that he admitted to having breached before the ink was dry, would be void of reason. We find no authority for the proposition that one who breaches the agreement not to prosecute can later enjoy the fruits of the agreement.

We agree with the circuit court that appellant's May 4 statement was voluntary and admissible, and shall not disturb the circuit court's denial of the motion to suppress.

### 2. Whether the evidence was sufficient to sustain the conviction for armed robbery.

Appellant next argues that the evidence was insufficient to support his armed robbery conviction, suggesting that the State "presented absolutely no evidence at trial" to establish his participation in the underlying felony—the armed robbery committed by Blake.

The test for sufficiency of the evidence presented at trial is "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Smith,* 374 Md. 527, 533, 823 A.2d 664 (2003). It is undisputed that appellant did not actually carry out the armed robbery; rather, his culpability rests in his involvement as an accomplice, or principal in the second degree. Therefore, our determination of sufficiency will be viewed from that perspective.

"A principal in the second degree is one who is actually or constructively present when a felony is committed, and who aids or abets in its commission." *Pope v. State,* 284 Md. 309, 326, 396 A.2d 1054 (1979). At trial, the state presented evidence to support its theory of the case, which was that appellant knew that Blake and Blankumsee planned to rob someone at Washington Gardens. The State introduced appellant's May 4 statement to the police, in which he admitted to knowing, before he went to the Washington Gardens, that Blake intended to commit a robbery at that place. The State introduced evidence of Blake's earlier telephone call to appellant advising specifically of his plan. After arriving at the Washington Gardens, appellant waited in Blake's car while the robbery was carried out. Shortly thereafter, appellant was in possession of the handgun that Blake had used to accomplish the robbery of Snyder.

"A *principal in the second degree* is one who is guilty of [a] felony by reason of having aided, counseled, commanded or encouraged the commission thereof in his presence, either actual or constructive." *State v. Ward,* 284 Md. 189, 197, 396 A.2d 1041 (1978), *overruled on other grounds by Lewis v. State,* 285 Md. 705, 404 A.2d 1073 (1979) (emphasis in original). "One may ... encourage a crime by merely standing by for the purpose of giving aid to the perpetrator if necessary ... Guilt or innocence ... is not determined by the quantum of [the] advice or encouragement" of the abettor. *Pope, supra,*

284 Md. at 332, 396 A.2d 1054 (quoting R. Perkins, Criminal Law 659, 2d ed.1969).

██ Always, we bear in mind that the jury, as the trier of fact, is in the best position to judge the evidence and to make demeanor-based credibility assessments. Therefore, we conclude that, based on appellant's advance knowledge that a robbery was to be committed, his presence of the scene, and his post-robbery efforts, a rational jury could conclude that appellant assisted in the robbery as a principal in the second degree. We find the evidence legally sufficient to support the jury's verdict as to the armed robbery conviction.

### 3. Whether the evidence was sufficient to sustain the conviction for conspiracy to commit armed robbery.

██ Appellant also argues that the State did not present sufficient evidence to sustain his conviction of conspiracy to commit armed robbery. Our standard of review is the same as for the armed robbery analysis: whether, upon viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

██ Conspiracy is a common law crime. To sustain a conspiracy conviction, the State must prove that two or more persons agreed to accomplish an unlawful purpose, or to achieve some lawful purpose by illegal means. *Townes v. State,* 314 Md. 71, 75, 548 A.2d 832 (1988). The crime of conspiracy is complete when the unlawful agreement is reached, and no overt act in furtherance of the agreement need be shown. *Id.*

Appellant argues that the State did not produce any evidence of an agreement between himself and Blake or Blankumsee. We find the evidence to have been sufficient. Appellant's statement to police included an admission that he knew about the planned robbery prior to meeting Tione Blake. Specifically, appellant told police that Blake called him the night of the incident and said, "Got something for us to do," the "something" being a "stick" (robbery) at Washington

Gardens. Other evidence at trial made clear that appellant met Blake and Blankumsee at Washington Gardens and waited in the car while the robbery was carried out by Blake. In short, appellant knew the robbery was planned, met the principal robbers at the scene of the crime, and remained at the scene during, and after, the commission of the crime. That evidence is sufficient for a finding of guilt by a rational jury. We find no error.

### 4. Whether the evidence was sufficient to sustain the conviction for first-degree felony murder.

Appellant challenges the sufficiency of the evidence to support his conviction of first-degree felony murder. The State's theory was that there was a sufficient nexus between the robbery of Andrew Snyder and the subsequent shooting death of Dennis to support the felony murder conviction. Appellant specifically contends that the evidence was insufficient to establish the requisite causal connection between the robbery and the homicide of a victim unrelated to the earlier robbery. The shooting, according to appellant, was an independent act, separate and apart from the robbery. We agree.

As discussed *supra,* we review the evidence in the light most favorable to the State to determine whether any rational finder of fact could find, at least inferentially, all of the elements of first-degree felony murder. A defendant is guilty of first-degree felony murder if the murder was "committed in the perpetration of or an attempt to perpetrate" an enumerated felony. Md.Code Ann., Crim. Law Art., § 2–201(a)(2002, 2004 Cum.Supp.). In the instant case the enumerated felony is the robbery of Andrew Snyder. However, "there must be a direct causal connection between the homicide and the felony. Something more than mere coincidence in time and place between the two must be shown; otherwise, the felony murder rule will not be applicable." *Mumford v. State,* 19 Md.App. 640, 644, 313 A.2d 563 (1974).

The sequence of events which led to the ultimate shooting of Dennis was put into motion by Blake's earlier telephone

conversation with appellant, which alerted appellant to the prospect of a robbery at the Washington Gardens. Appellant arranged transportation to that location, where he met up with Blake, Blankumsee (whom appellant did not previously know), and others. Appellant remained in the parking lot, never entering the apartment in which the party was taking place.

Blankumsee, together with Israel Martinez and Victor Anderson, left the parking lot, entered the apartment, and there put a gun to the head of another party-goer. Some time later (the testimony varied as to the exact elapsed time), Blake and others approached Andrew Snyder outside of the apartment and robbed him of his money. Snyder went indoors and advised his friends what had happened, whereupon Snyder and others returned outdoors where they encountered Blankumsee, Anderson, Martinez, and Blake. By any measure, at least five minutes passed before the group returned outdoors. In addition, some time had obviously elapsed during which Snyder returned to the apartment, after having been robbed, and discussed the event with his friends.

Some additional time necessarily elapsed during which Blankumsee, and the others, joined up with appellant, who was still in a car, socializing with several girls. And, even more time necessarily elapsed during which Dennis and others gathered and approached Blankumsee.

We find nothing in the record that would lead to an inference that the shooting of Dennis by appellant bore any connection with the robbery of Snyder by Blankumsee and others. The shooting of Dennis, or the use of the handgun by appellant, was not in furtherance of the robbery. The robbery was complete when Snyder returned to the apartment to report it. The shooting did not occur until at least five minutes, and obviously more, after the robbery was complete. With the robbery complete, the shooting was a separate and independent act. The attenuation was such that the homicide could not have been conducted in furtherance of the robbery; therefore, the separate and completed crime of robbery will

not support appellant's conviction for first degree felony murder.

Because the essential elements of first-degree felony murder could not have been found by any rational finder of fact, we find the evidence to be legally insufficient and reverse the conviction of first-degree felony murder.

5. ***Whether the circuit court committed reversible error by not polling or hearkening the jury before the jurors were discharged.***

Following two days of trial, the jury retired to deliberate at 5:10 p.m. on January 5, 2005. When the jury returned with its verdicts at 6:52 p.m., the following transpired:

THE COURT: Good evening, ladies and gentlemen. Madame Clerk, would you take the verdict of the jury please?

MADAME CLERK: Ladies and gentlemen of the jury, are you agreed as to [your] verdict? If so, please answer "we are."

THE JURY: We are.

MADAME CLERK: Who shall say for you? Mr. Foreman, please stand.

Whereupon, Madame Clerk asked the foreman, with respect to each charge, whether the jury's verdict was "guilty" or "not guilty." The foreman answered specifically as to each, by saying either "guilty" or "not guilty." After hearing the verdicts read in open court, the presiding judge said:

THE COURT: Alright, ladies and gentlemen of the jury, I want to thank you very much for your hard work, for your patience. It's been a long two days, I understand. You've been here until late tonight, and I certainly do want to thank you for everything. And it's been a very long and trying case, but you've put in a lot of time and a lot of hard effort. *With my thanks, you are all excused.* Thank you once again.

(Emphasis added).

The transcript reveals that "(Whereupon the jury was excused and exited the courtroom . . .)." There is no mention in

the transcript of the proceedings of either a poll of the jury or of hearkening. Indeed, in view of the subsequent proceedings, in February, appellant and the State agree that neither hearkening nor polling occurred.

Appellant now argues that the circuit court committed reversible error by discharging the jury before it was polled or its verdict hearkened; that, as a result of neither polling nor hearkening, the verdict was not properly recorded; that the verdict is a nullity; and that reversal is required. The State responds that appellant did not preserve this issue for appeal because trial counsel did not request that the jury be polled and did not object to the court's manner of taking the verdicts, or its dismissal of the jury without polling or hearkening. Alternatively, the State argues that, assuming error, the circuit court effectively cured the error by recalling and polling the jury at a later time (February 14, 2005). Appellant responds that, assuming waiver, the court's failure to poll the jury or hearken the verdict is plain error.

██ Our review of a question of the regularity requirement of a jury verdict in a criminal case is *"de novo,* considering the totality of the circumstances." *Caldwell v. State,* 164 Md.App. 612, 643, 884 A.2d 199 (2005).

Both polling of the jury and hearkening of the verdict are of ancient origin and continue in today's practice as common law concepts. Provisions for polling the jury have been codified in Md. Rule 4–327(e):

**Poll of jury.** On request of a party or on the court's own initiative, the jury shall be polled after it has returned a verdict and before it is discharged.

Nowhere in either statute or rule is there mention of hearkening, which remains as part of the common law of Maryland.

Regarding polling, Judge Gilbert pointed out in *Ross v. State,* 24 Md.App. 246, 253, 330 A.2d 507 (1975), *rev'd on other grounds,* 276 Md. 664, 350 A.2d 680 (1976):

[A]n accused has an absolute right to have the jury polled, a right of constitutional dimension insofar as it serves to

assure him his right under the Maryland Constitution to be convicted only upon a unanimous verdict. The only limitation upon the right is that it be exercised after the verdict and before the jury is discharged.

The jury before whom Ross was tried returned a guilty verdict on one count, but was undecided on another. As to the first count, the jury was polled, but the verdict was not hearkened. Later, after the jury was unable to reach a verdict on the second count, Ross requested that the first verdict be hearkened. This Court said that "[w]e reject appellant's attempt to employ hearkening to defeat the finality of a verdict already conclusively certified by the poll of the jury." *Id.* at 255, 330 A.2d 507.

In discussing the interplay between polling and hearkening, Judge Gilbert further noted:

> While it is now recognized that recordation of the verdict coupled with the hearkening of the jury is an adequate safeguard of the right to a unanimous verdict, it has never been the law in Maryland that hearkening is *the* prerequisite to an acceptable verdict where the jury has been polled. In other words it has not been doubted that polling is a fully commensurable substitute for hearkening. The point was made in *Givens v. State,* [76 Md. 485, 25 A. 689 (1893) ], *supra.*

* * *

> The Court recognized in *Givens* that polling is the more particular means "to secure certainty and accuracy, and to enable the jury to correct a verdict, which they have mistaken, or which their foreman has improperly delivered," *but in the absence of a request for a poll the practice of hearkening must be followed.*

*Id.* at 253–54, 330 A.2d 507 (Emphasis added).

The return of a verdict by a jury is comprised of three distinct procedures, which Judge Battaglia recently articulated in *Jones v. State,* 384 Md. 669, 682–84, 866 A.2d 151 (2005):

After the jury returned to the jury box to deliver its verdict, the foreman, speaking for the jury, orally answered the inquiry of the clerk and stated the verdict to the trial court. Although in the colonial period, polling occurred immediately upon the jury's return to the court regardless of a failure to request to do so, at some point after 1893, the request to poll the jury came to be made after the oral announcement of the verdict. A poll of the jury is conducted to ensure the unanimity of the verdict prior to its entry on the record. "The underlying requirement of a final verdict is that it be unanimous." The requirement of unanimity is, of course, a constitutional right set forth in Article 21 of the Maryland Declaration of Rights, which states that "every man hath a right ... to a speedy trial by an impartial jury, without whose unanimous consent he ought not to be found guilty," and implemented through Rule 4–327(a).

\*　　\*　　\*

A defendant has the absolute right to poll the jury.

\*　　\*　　\*

In order to exercise the right to poll, the defendant must request to poll the jury. The procedure for polling is set forth in Maryland Rule 4–327(e) ...

\*　　\*　　\*

After polling, the third step occurs when the jury is hearkened to its verdict as "the traditional formality announcing the recording of the verdict."

\*　　\*　　\*

Hearkening of the jury to the verdict, like polling the jury, is conducted to "secure certainty and accuracy, and to enable the jury to correct a verdict, which they have mistaken, or which their foreman has improperly delivered." *It is in the absence of a demand for a poll that a hearkening is required for the proper recordation of a verdict.* (emphasis added).

(Citations omitted) [5]

Maryland Rule 4–327(e) requires the court to poll the jury only upon the request of a party. Not having requested that the jury be polled, appellant has waived the entitlement afforded by Md. Rule 4–327(e), unless we exercise our discretion to invoke plain error, as appellant suggests we ought to do.

 We first observe that the invocation of a plain error review is purely discretionary. As Judge Moylan has expressed,

The preservation rule contemplates error. It assumes that an error has probably occurred. Its concern is that the error was not brought to the trial judge's attention so that he could have had the opportunity to correct it. Indeed, if the [matter] in question were not in error, it would make very little difference whether the point had been preserved or not.

*Morris v. State,* 153 Md.App. 480, 512, 837 A.2d 248 (2003).

 Failure of the court to poll the jury, in the absence of a request by either appellant or the State, is not plain error; in fact, it is not error at all. A poll of the jury is a matter of right, if requested by a party, or ordered *sua sponte* by the court. As to the parties, polling is a right that is afforded by Md. Rule 4–327(e) and may be waived, either affirmatively or by inaction. The jury may likewise be polled "on the court's own initiative." We do not read that language as imperative or mandatory. Therefore, there is no error in the want of a jury poll where the court, *sub silentio,* declined to exercise its discretion to order a poll when the parties did not request it. Of course, failure to order a poll in the face of a request would be error.

 Hearkening, as we have noted, is not a procedure that has been prescribed by rule; rather, it retains its common law

---

**5.** The Court's opinion in *Jones* also provides an historical perspective of the development of the hearkening, polling, and recordation of a jury verdict in a criminal case.

character. Our review of Maryland law involving questions of the hearkening of the jury's verdict brings several cases to our attention.

First, of course, was *Givens v. State,* 76 Md. 485, 487, 25 A. 689 (1893), wherein the Court of Appeals laid down what has become the historical, and often quoted, process of verdict-taking:

When the jury have come to a unanimous determination with respect to their verdict, they return to the box to deliver it. The clerk then calls them over, by their names, and asks them whether they agree on this verdict, to which they reply in the affirmative. [The clerk] then demands who shall say for them; to which they answer, their foreman.

Givens, after the jury returned a guilty verdict (of dredging oysters contrary to the General Oyster Law of Maryland), assigned error upon the failure of the clerk, before the discharge of the jury, to hearken the verdict. *Id.* The Court of Appeals held that failure to warrant reversal and a new trial. *Id.*

Although the issue presented to the Court was the clerk's failure to hearken the verdict, the Court observed that "[a] prisoner is entitled as a matter of right to a *poll* of the jury in this State, and to have each juror assent to the verdict." *Id.* That right, it was said, is to preserve the ability of the court to correct an erroneous verdict before it is recorded. *Id.* It is curious that the *Givens* Court, in addressing the appellate issue of "hearkening" should refer as well to "polling." Did the Court assume "hearkening" and "polling" to be the same process with the same purpose? There is nothing in the opinion to guide a conclusion.

The Court of Appeals discussed polling, but not hearkening, in *Heinze v. State,* 184 Md. 613, 42 A.2d 128 (1945), where the question was the trial court's handling of an inconsistent verdict. Appellants were charged with larceny and receiving stolen goods, to which the jury returned a general verdict of guilty. *Id.* at 616, 42 A.2d 128. The jury were polled at the

request of defense counsel. *Id.* Citing *Givens,* the Court noted that until the verdict has been recorded, the jury have the right to amend or change the verdict. *Id.* at 616–17, 42 A.2d 128. The Court further noted that the poll of the jury served to point out the inconsistent verdict and to cure the defect. *Id.* at 620, 42 A.2d 128. There was no hearkening, no request for hearkening, and no finding by the Court that hearkening was required, or that the lack of hearkening was error. *Id.*

Among several issues before the Court of Appeals in *Glickman v. State,* 190 Md. 516, 60 A.2d 216 (1948), was the propriety of a verdict finding the defendant guilty under one count of an indictment containing several counts, but silent as to the remaining counts. There, the jury deliberated and returned with a guilty verdict for only one of the two indictments. *Id.* at 522, 60 A.2d 216. After hearing the guilty verdict, the court ordered the jury to return to the jury room to deliberate on the second indictment. *Id.* When the jury returned and announced the verdict for the second indictment, the court hearkened them with regard to the second verdict and then discharged them. *Id.* at 523, 60 A.2d 216. At no time did the court hearken the jury with regard to its verdict for the first indictment. *Id.*

Glickman asserted error because the jury verdict was not properly hearkened. We infer from the Court's opinion that polling was neither requested nor conducted. The Court reaffirmed the procedure pronounced in *Givens* and endorsed in *Heinze,* but, significant to the issue presented in the case *sub judice,* said:

> But the record also discloses that no objection was made to the verdict on *this ground* [want of hearkening], and we must hold that such objection was waived. "This Court has recently held in *Conley v. Warden of the Maryland House of Correction,* 190 Md. 750, 59 A.2d 684 [ (1948) ] as follows: 'If error was committed by the trial court in receiving or entering the verdict, it was incumbent upon the accused, or

his counsel, to raise the question by objection or motion in the trial court, and appeal from the court's ruling.' "

*Id.* at 526, 60 A.2d 216.

Judge Orth also discussed the procedure for the rendition and recordation of a jury verdict in *Smith v. State,* 299 Md. 158, 472 A.2d 988 (1984), referring to *Givens* and to L. Hochheimer, *The Law of Crimes and Criminal Procedure* (2d ed.1904), saying for the Court:

> A poll of the jury serves the same purpose as that of hearkening the verdict. *Givens,* 76 Md. at 487, 25 A. 689. "[I]t has never been the law in Maryland that hearkening is *the* prerequisite to an acceptable verdict where the jury has been polled. In other words, it has not been doubted that polling is a fully commensurable substitute for hearkening. *Ross [v. State]* 24 Md.App. [246] at 254, 330 A.2d 507 [ (1975) ]." It is in the absence of a demand for a poll that a hearkening is required for the proper rendition of a verdict.

*Id.* at 166, 472 A.2d 988 (emphasis in original).

▇▇▇▇ Appellant correctly posits that, in the absence of a demand for a poll, a hearkening is required for the proper recordation of a verdict. *See Jones, supra,* 384 Md. at 686, 866 A.2d 151. Further, a court's failure to hearken the jury is grounds for a new trial. *See e.g., Givens, supra,* 76 Md. at 485, 25 A. 689. We are not unmindful of the statement by the Court of Appeals in *Glickman, supra,* that a party waives its right to raise this error on appeal if no objection is made at trial. 190 Md. at 526, 60 A.2d 216. Nonetheless, we believe the law of this state to be clear, as established by *Smith, supra,* 299 Md. at 166, 472 A.2d 988 ("It is in the absence of a demand for a poll that a hearkening is required for the proper rendition of a verdict."), and the recent reiteration in *Jones, supra,* 384 Md. at 686, 866 A.2d 151, that a verdict that has not been followed by either polling or hearkening, has not been properly rendered and recorded, and is a nullity.

We recognize that in each of the cases discussed, *supra,* there was a misstep in the arrival at the verdict and/or the communication of the verdict to the court: *e.g.,* not all counts

considered; all counts considered, but not reported by the foreman; or, verdicts incorrectly reported to the court. In the instant case there was no such irregularity—all of the counts were considered by the jury, a verdict was rendered as to each, and each was accurately reported to the court by the foreman.

■■■ We hold, however, that, even absent a defect in the reporting of the verdict by the foreman or forelady, hearkening is required in the absence of a request for a poll of the jury. It matters not which procedure is first called for—the poll or hearkening.[6] If the jury is polled, a failure to hearken will not be fatal. If the verdict is hearkened, a poll need not be conducted absent a request by a party. Absent both, the verdict is defective and a new trial must be ordered.

### Recalling the Jury

The State urges us to the position that any defect in the taking and recording of the verdicts in this case was cured by the circuit court's recall of the jurors several weeks later. Appellant and counsel were present. At that time, the 12 persons who constituted the jury were reassembled, again sworn, and reaffirmed their unanimity. The clerk read each count and the foreman responded accordingly, by saying either "guilty" or "not guilty." Thereafter, the court asked the clerk to poll the jury and each juror was asked as to the certainty of his or her verdict. The verdict was not hearkened. Thereafter, the jury was discharged. That process, we hold, was of no effect and did not serve to rehabilitate the earlier defective verdicts.

■■■ Once jurors are discharged and dispersed, they no longer constitute a jury. *Maloney v. State,* 17 Md.App. 609, 626, 304 A.2d 260 (1973) *cert. denied,* 269 Md. 762 (1973). In *Maloney,* after the jury had been hearkened to its verdict,

---

6. Traditionally, the court or the clerk asks the jury to hearken to its verdict immediately upon completion of the rendition by the foreman or forelady, followed by polling, if requested.

counsel for Keller, a co-defendant, asked that the jury be polled. The trial judge denied the request, erroneously believing that, the jury having been hearkened, the request for polling came too late. *Id.* at 617, 304 A.2d 260.

This Court observed that "[o]ne of the objects in polling the jury is to enable a juror to correct a verdict about which, on further consideration, he has doubt, and to declare in open court his judgment *in praesenti.*" *Id.* at 626, 304 A.2d 260. Recalling a jury weeks later for polling did not cure the trial court's failure to poll jurors. *Id.* at 627, 304 A.2d 260. "The short of it is that at the time they were reassembled they no longer constituted a jury to be polled because they had been discharged and dispersed." *Id.* at 626, 304 A.2d 260. Hearkening of the verdict, in order to comply with our common law standard, and/or polling of the jury, if requested by a party, or initiated by the court, in order to comply with Md. Rule 4–327(e), must occur before the jury is discharged and dispersed. Once a jury is dispersed, and beyond the presence of the court, it cannot later be reconstituted.

**JUDGMENTS OF THE CIRCUIT COURT FOR WASHINGTON COUNTY REVERSED; CASE REMANDED FOR A NEW TRIAL ON ALL COUNTS EXCEPT FIRST–DEGREE FELONY MURDER.**

**COSTS ASSESSED TO WASHINGTON COUNTY.**